**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 03 201̶4

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

BRENDA GLOVER, on behalf
of herself and all others similarly
situated,

**PLAINTIFF**

v.                                    CASE NO. *4:14cv644-JLH*

HOUSING AUTHORITY OF THE
CITY OF LITTLE ROCK, d/b/a
METROPOLITAN HOUSING
ALLIANCE, and RODNEY FORTE,
**Executive Director of Metropolitan**
**Housing Alliance, in his Official Capacity,**

This case assigned to District Judge _Holmes_
and to Magistrate Judge _Young_

**DEFENDANTS**

**JURY TRIAL DEMANDED**

### CLASS-ACTION COMPLAINT

Plaintiff Brenda Glover ("Plaintiff"), on behalf of herself and all others similarly situated, brings this Complaint against the Housing Authority of the City of Little Rock, d/b/a Metropolitan Housing Alliance ("MHA"), and Rodney Forte ("Forte") in his official capacity. Plaintiff seeks certification of her claims against Defendants as a class action. In support thereof, Plaintiff states as follows:

### INTRODUCTION

1.      Plaintiff brings this lawsuit under 42 U.S.C. § 1983 to challenge Defendant MHA's unconstitutional adjudication and termination of Plaintiff's and Class Members' federal housing benefits.

2.      Plaintiff is an indigent and disabled resident of Pulaski County, with a monthly household income of $746. From 2006 to September 2014, she received a housing subsidy through the federal government's Section 8 Housing Voucher Program ("the Section 8

1

Program"), which MHA administers. During that time, Plaintiff was a model tenant. She was never late on a rent payment and never missed a payment.

3.      For the bulk of this period, Plaintiff's household consisted of herself, two of her daughters, and three of her grandchildren. Within the past year, however, one daughter and two grandchildren moved out. In light of this new, smaller iteration of Plaintiff's household—now consisting of herself, her daughter, and her granddaughter—Plaintiff's Section 8 housing subsidy was reduced by MHA in July of 2014. Because of the reduction, Plaintiff's portion of the rent went from $1.00 per month to $303.00 per month. Plaintiff could not afford the rent increase, so she sought to transfer her Section 8 voucher to a smaller rental unit. However, due to MHA's requirements, Plaintiff would not be able to transfer her voucher—and thus resume her lowered rent payments—until September. Thus, she would have to pay almost one half of her monthly income on rent for both July and August.

4.      Plaintiff abided by her agreement. To cover July's rent, she borrowed money from her friends, her family, and her church, and she sold many of her possessions, including the family's computer. By August, however, Plaintiff had run out of options. She approached her landlord and asked that he take August's rent from her security deposit of $850. The landlord agreed to this, and faxed a signed writing of this agreement to MHA on August 4.

5.      However, during the next week, the landlord told Plaintiff that he was going to take *all* of the $850 rent deposit. Plaintiff filed a complaint with the Arkansas Attorney General's office. On that same day, the landlord gave Plaintiff a notice to vacate charging that she had failed to pay August rent—even though they had already arranged, in writing, for the alternative payment arrangement.

6.      The landlord also sent a copy of this notice to MHA, who promptly sent Plaintiff a vague letter informing her that her Section 8 benefits were being terminated. The letter offered as the lone grounds for termination: "Ten day Eviction Notice to vacate for back rent owed in the amount of $303 for August."

7.      Plaintiff sought an administrative hearing to contest MHA's decision. However, when she arrived at the hearing it quickly became apparent that any attempt at a challenge would be futile. MHA's hearing officer refused to tell Plaintiff what burden of proof was required to challenge the termination decision, or even which party bore the burden of proof. The hearing officer further told Plaintiff that the only item of evidence she would consider was the landlord's notice to vacate stating that Plaintiff had failed to pay rent, *even though the hearing officer also had in her possession the landlord's signed writing stating that he had agreed to deduct August's rent from Plaintiff's security deposit.* Plaintiff was robbed of a meaningful hearing, and was instead subjected to an advocate for the agency rubber stamping its original decision without any consideration of evidence favorable to Plaintiff.

8.      Further, during this hearing, MHA's employees repeatedly stated that these practices were routine MHA policies. Indeed, in response to a subsequent FOIA by Plaintiff's undersigned counsel, MHA conceded that 964 families have lost their Section 8 benefits as the result of having received a notice to vacate—and nothing more—since October 24, 2011.

9.      It is untenable to substitute a notice to vacate for full process. The notice to vacate simply proves that a landlord has claimed, with no further evidence, that a tenant is in arrears. It is not a judicial determination of such fact and in many instances it is also incorrect. For example, Plaintiff has appeared in court twice because of her landlord's retaliatory accusations and, when allowed the protections of due process, has prevailed in court *both times*.

3

MHA's policies and procedures allow families to lose their benefits based upon the uncontested word of tenants' landlords. These landlords are not present at pre-termination hearings, so tenants may never directly challenge their word through cross-examination. Nonetheless, MHA treats this hearsay evidence as dispositive, and any attempt by Plaintiff or Class Members to challenge the notice to vacate is futile.

10.     Contrary to the Due Process Clause of the Fourteenth Amendment and federal regulations, MHA terminated Plaintiff's housing assistance without evidence of a judicial order to evict; provided insufficient notice of the basis for terminating benefits; failed to provide an impartial hearing officer; failed to properly weigh all available evidence, including evidence clearly absolving Plaintiff; failed to provide Plaintiff an adequate opportunity to rebut the charges against her; and failed to provide a post-hearing written decision substantiating the hearing officer's final decision in a manner compliant with federal law.

11.     Plaintiff seeks an injunction requiring Defendants to restore her Section 8 voucher. Without injunctive relief, Plaintiff faces homelessness.

12.     Additionally, Plaintiff seeks (1) a declaration that Defendants' acts violated federal law and (2) damages in an amount equal to subsidies wrongfully revoked as alleged herein.

13.     Plaintiff seeks to bring her claims on behalf of a Class of Section 8 benefit recipients whose housing benefits were terminated on the basis of a notice to vacate and on behalf of a Subclass of Section 8 benefit recipients whose benefits were terminated on the basis of a notice to vacate and who appealed that determination.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. Further, Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 & 2202 and the general legal and equitable powers of this Court.

15.     Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

16.     Plaintiff Brenda Glover is a resident of Pulaski County, Arkansas.

17.     Defendant MHA is a local Public Housing Agency responsible for administering the Section 8 Program for Little Rock, AR.

18.     Defendant Rodney Forte is the executive director of MHA. He (or his successor in office) is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.     The Section 8 Housing Voucher Program

19.     Congress enacted the Section 8 Housing Voucher Program to provide payment to private landlords, on behalf of low-income families, while simultaneously providing those families with the latitude to move from one housing option to another. Under the Section 8 Program, MHA signs an annual contributions contract with the United States Department of Housing and Urban Development ("HUD"). Through this contract, HUD agrees to pay rental subsidies for eligible low-income families to obtain decent, safe, and sanitary housing. MHA is the facilitator of the Section 8 Program in Little Rock, entering into contracts with participating landlords for housing-assistance payments on behalf of qualified low-income families such as Plaintiff. In so doing, MHA is bound by the rules and regulations established by Congress and by HUD, including those described herein.

20.     Once a family is approved for Section 8 Housing, they obtain a voucher from MHA, locate a rental unit meeting the criteria set by MHA, and request lease approval from MHA.  Once the lease is approved, the family signs a lease with the landlord.  Concurrently, the landlord and MHA sign a Housing Assistance Payments Contract ("HAP Contract").  Subsequently, the family pays a percentage of their adjusted monthly income to the landlord as the total tenant payment, while MHA pays the difference.

21.     Housing subsidies are calculated based upon families' income and composition.  HUD requires that families periodically undergo recertification in order to make sure that their benefits are accurately calculated.  To be recertified, a family must undergo an annual examination in order to verify any changes in income or family composition. The family's rent obligation is increased or decreased accordingly. *See* 24 C.F.R. § 982.516.   Where a determination is made to raise the tenant's rent obligation, MHA's Administrative Plan states that notice of the increase must be mailed 30 days prior to the "scheduled effective date of the annual recertification." MHA Administrative Plan, Chapter 12, Section C "Notification of Results of Recertifications," Subsection "Family Share/Tenant Rent Increases."

## II.     Plaintiff's Section 8 Housing Benefits and Their Improper Termination

### A. Plaintiff's participation in the Section 8 Program.

22.     Plaintiff is 53 years old and disabled.  She has participated in the Section 8 Housing Voucher Program with MHA since 2006.  During that time, her family has rented various units, including a house managed by Rental Realty, Inc. ("the Landlord").[1]

23.     Plaintiff's income is $746 per month.  Until mid-2014, her responsibility for monthly rent under the Section 8 Program was $1.00, while MHA paid the remaining balance.

---

[1] Rental Realty conducted business through a property manager, with whom Plaintiff dealt on a day-to-day basis. In this complaint, the term "Landlord" includes the property manager.

24.     Over the course of her participation in the Section 8 Program, Plaintiff has never failed to pay rent and has been a model tenant.

25.     Without a subsidy through the Section 8 Program, Plaintiff will suffer extreme financial hardship.

### B. Plaintiff requests to transfer her Section 8 voucher pursuant to federal regulations and arranges with the Landlord to pay rent.

26.     Following MHA's annual recertification process, Plaintiff learned that her subsidy would be reduced as a result of a decrease in the number of family members in her household—one of her daughters and two of her grandchildren had moved out the previous year, reducing her household to herself, another daughter, and her granddaughter.  Whereas previously Plaintiff's family of six had been eligible for subsidies for a three-bedroom unit, she and her daughter and granddaughter were now only eligible for subsidies for a two-bedroom unit.  In May of 2014, Plaintiff learned that, due to the change in her household size, her rent obligations for her three bedroom unit would rise from $1.00 to over $300.00, with the change going into effect on July 1, 2014.[2]

27.     Upon learning of this drastic increase, Plaintiff asked that she be allowed to transfer her Section 8 housing voucher to a smaller unit, thus bringing her rent obligation back to what she could afford.  MHA was still processing Plaintiff's request as of July 1, 2014, at which point Plaintiff was obligated to begin paying rent at the increased rate.  Through a combination of borrowing from friends, family, and her church, as well as by selling personal items such as her laptop computer, Plaintiff was able to come up with her share of the July rent at the new, increased rate.

---

[2] Plaintiff's rent obligation initially rose to $315. Then, at the beginning of July, she received a notice that her rent obligation would be $303.

28.     In early August 2014, MHA notified Plaintiff that she could transfer her Section 8 voucher. However, the transfer could not occur until September, as Plaintiff's Landlord was entitled to 30 days' notice prior to the move.  Plaintiff was thus obligated to pay rent at the increased rate for August 2014 as well.

29.     Concerned that she could not come up with the August rent, Plaintiff approached the Landlord on or about the end of July or beginning of August to discuss a grace period for paying August's rent.  She had previously submitted a request to the Landlord to rescind her lease, thereby allowing her to transfer her Section 8 housing voucher.  The Landlord initially agreed to allow Plaintiff to pay her rent late in August.  The agreement was not in writing.

30.     Subsequently, on August 4, 2014, the Landlord agreed to (1) release Plaintiff from her lease and (2) deduct Plaintiff's August rent from her $850 security deposit.  This agreement was memorialized in writing on or about August 4, 2014, in a document titled "Authorization for Mutual Rescission of Section 8 Lease." *See* Exhibit 1.  At the bottom of that document, a handwritten note states, "Rental Realty is releasing Brenda Glover from her current lease.  **Her outstanding balance owed will be paid with her security deposit that she put down.**" (Emphasis added.)

### C. The Landlord reneges on the rent agreement and files a notice to vacate under Arkansas's criminal eviction statute.

31.     When Plaintiff inquired when she would receive the remainder of her security deposit, the Landlord informed Plaintiff that she would not receive *any* of her security deposit. Plaintiff disputed the Landlord's grounds for withholding her deposit. After their disagreement reached an impasse, Plaintiff filed a complaint with the Arkansas Attorney General.

32.     On August 11, 2014, the Landlord received a letter from the Arkansas Attorney General informing the Landlord that Plaintiff had filed a complaint against it. That same day, the

Landlord served Plaintiff with a 10-day notice to vacate for back due rent in the amount of $303.00—*the same amount the Landlord, in writing, had committed to accepting from Plaintiff's security deposit*—and also provided MHA with a copy of the notice to vacate. Exh. 2.

33.   Under Arkansas law, a tenant's failure to timely pay rent terminates the rental agreement between landlord and tenant, and the tenant's continued occupation of the premises is at the forbearance of the landlord. *See* Ark. Code. Ann. § 18-16-101(a). The landlord has the option to provide the tenant with a 10-day notice to vacate the premises. If the notice is provided, the tenant is guilty of a misdemeanor if she fails to surrender the premises within ten days. *See id.* § 101(b)(1). The notice does *not* constitute a judicial order of eviction.

34.   On August 13, 2014, Plaintiff attempted to tender August rent, but the Landlord would not accept it.  Later in the month, Plaintiff was served with a criminal citation for failure to vacate.  Plaintiff appeared in criminal court on September 2, 2014, and the charges were *nol prossed*.

35.   On September 3, 2014, the Landlord served Plaintiff with a *second* notice to vacate for failure to pay rent, *even though September rent would not become late until September 4, 2014*.

36.   On September 5, 2014, Plaintiff paid her September 2014 rent, but the Landlord mailed back her money order.  Plaintiff was *again* served with a criminal citation for failure to vacate and appeared for trial on October 8, 2014.  At trial, Plaintiff's counsel made an oral motion to dismiss, which Judge Alice Lightle granted.

37.   The Landlord never obtained a judicial order to evict Plaintiff.

**D. MHA terminates Plaintiff's Section 8 housing assistance.**

38.     On or about August 12, 2014, Plaintiff received a letter from MHA stating that her Section 8 Housing benefits would be terminated effective August 27, 2014 (the "Notice Letter"). *See* Exhibit 3. The lone explanation for the termination of benefits read, "Ten day Eviction Notice to vacate for back rent owed in the amount of $303 for August."

39.     The Notice Letter further stated that, should Plaintiff wish to appeal this termination, she could request an "informal hearing," which would "be scheduled within 14 calendar days from the date of receipt of the completed request form." Plaintiff submitted a form requesting a hearing on August 14, 2014.

40.     MHA ultimately scheduled Plaintiff's hearing for September 4, 2014, seven days past MHA's stated deadline.

41.     On September 4, 2014, Plaintiff appeared at her informal hearing, represented by counsel. Also present were three MHA employees: Hearing Officer Asonja Nuckolls, Administrative Services Director Marshall Nash, and Housing Specialist Cheryl Roberson. Roberson was the person who made the decision to terminate Plaintiff's benefits. Nash's role was not explained. The transcript of the informal hearing shows that Nash acted as an advocate for MHA as well as a support beam for Hearing Officer Nuckolls, who admitted that "[t]his is actually my first hearing with an attorney." *See* Exh. 4, Transcript at 3.

42.     As a preliminary matter, Plaintiff's counsel asked Nuckolls to identify which party bore the burden of proving the basis for termination of benefits. Nuckolls would not answer this question. Nash stepped in and stated: "Your argument is so noted but let her go ahead and go through her process and then whatever argument you have, when we get to the end, just make it and it will be on the record." *Id.*

43.    Nash also implied that it was improper for Plaintiff's counsel to ask about the burden of proof: "We ain't here to fight. We're just here to give her an opportunity to be heard. But we hadn't—we can't get to that if counsel is gonna, you know. So let's—but you're going to get a chance to—I know you worked on it; can't wait to hear it. But let's let her go through her process." *Id.* No one ever clarified whether "her process" required MHA or Plaintiff to shoulder the burden of proving or disproving a valid basis for termination.

44.    Plaintiff's counsel also asked Nuckolls to clarify the regulatory basis for MHA's termination decision.   Nuckolls replied that she "can't cite the exact regulation."   *Id.* at 2. However, she said that MHA terminated Plaintiff's benefits because, as indicated by the notice to vacate, Plaintiff had failed to "pay [her] portion of the rent timely and abide by [her] lease." *Id.*

45.    Plaintiff attempted to explain that her rent was not in fact late because she had an agreement with the Landlord. Plaintiff's counsel further clarified this point in his argument to Nuckolls.

46.    Furthermore, Plaintiff's hearing file, which Nuckolls possessed, contained the document entitled "Authorization for Mutual Rescission of Section 8 Lease." *See* Exh. 1. In the portion of the document asking whether Plaintiff's account is delinquent, the Landlord represented that Plaintiff owed $303 for August rent. However, the Landlord bracketed this portion of the form and noted that Plaintiff's rent obligations were satisfied: "Rental Realty is releasing Brenda Glover from her current lease. **Her outstanding balance owed will be paid with her security deposit that she put down**." *Id.* (emphasis added).

47.    Despite this evidence that her rent was not, in fact, late, Nuckolls refused to consider it and determined that she could only consider the notice to vacate. Nuckolls' position is shown by the following colloquy between Plaintiff's counsel, Nuckolls, and Nash:

COUNSEL:        You're basically saying that any time a landlord makes an agreement with you to accept payment late and then reneges on the agreement, he's allowed to have the tenant be terminated from her voucher at that point and just—you have no control over that.

NUCKOLLS:       That's correct.

COUNSEL:        When in fact you do have control over that because if you believe her testimony today that the landlord, in fact, agreed to allow her rent to be late, then her rent's not technically late if the landlord allows her to pay rent past the date stated in the lease.

NASH:           I think what you're saying is that they rely on the four corners of the docket [*i.e.*, the notice to vacate]. They can't . . .

NUCKOLLS:       Exactly. We rely on what's in writing.

NASH:           This person could come in here and say there was no agreement. She says there is an agreement. So they just go by the document, sir.

COUNSEL:        But we don't know . . .

NASH:           Otherwise, I'm gonna interrupt you, but I don't want you to . . .

NUCKOLLS:       Right.

NASH:           . . . make their interpretation for them. That's not what they're saying.

Exh. 4, Transcript at 20–21.

        48.    Plaintiff's counsel also attempted to present mitigating evidence of Plaintiff's theretofore perfect record of paying rent and the hardship that the denial of Section 8 benefits would work upon her. However, Nuckolls refused to consider this evidence and declared that she had no discretion to consider factors besides the notice to vacate: "Let me just say this, the rules with regard to her being a model tenant for the years that she's been in the program, that really does not factor. That does not factor in. If the, if the family obligations are not followed, we are obligated to follow the HUD regulations and terminate assistance if rent's not paid." *Id.* at 13.

49.     Nuckolls took the position that MHA's receipt of the notice to vacate was a sufficient ground by itself to terminate Plaintiff's benefits and stated that MHA's policy is to terminate Section 8 Housing benefits whenever it receives a notice to vacate. For example, Nuckolls stated to Roberson, "So, *according to our policy*, once you received the notice you proceeded with what our rules are and proceeded with termination and sending a letter." *Id.* at 6 (emphasis added.) Roberson affirmed. *Id.* At another point, Nuckolls stated, "[W]hat Ms. Roberson received was the paperwork from the owner and that is what we act upon." *Id.* at 13.

50.     The following colloquy between Nuckolls and Plaintiff's counsel further clarified MHA policy:

COUNSEL:     If y'all receive a notice to vacate by the landlord, regardless of the reason, rent or other reason, is the Housing Authority's position that the voucher will be terminated at that point?

NUCKOLLS:     If it's a violation of family obligations, yes.

COUNSEL:     Just by receiving that notice, without a court order finding that the tenant, in fact, did violate the terms of the lease?

NUCKOLLS:     That is correct.

*Id.* at 26–27.

51.     The notice to vacate was the sole basis for termination of Plaintiff's benefits. No court has ever entered an order finding that Plaintiff's rent was late or that Plaintiff should be evicted. Indeed, Plaintiff has prevailed in each of the two hearings her Landlord initiated.

52.     At her hearing, Plaintiff was never provided an opportunity to cross-examine the Landlord upon whose representation the notice to vacate was based. MHA did not present any evidence to corroborate the representation in the notice to vacate that the rent was due and had not been paid.

13

53.     MHA failed to provide an impartial hearing officer for the hearing. Nuckolls' lack of impartiality is indicated by her failure to apply (or even to identify) the proper burden of proof, her failure to indicate a proper regulatory basis for termination of Plaintiff's benefits, and her failure to consider the substantial evidence that Plaintiff was *not* late on rent. Nuckolls made various conclusory statements in favor of MHA's position while refusing to consider mitigating evidence in Plaintiff's favor, as contemplated by federal regulations.  Nuckolls impermissibly conducted the hearing in the dual roles of adjudicator and advocate for MHA.

54.     Moreover, by interjecting himself into the role of hearing officer and standing in Nuckolls' shoes, Nash improperly served as both an advocate for MHA and hearing officer.

55.     Following the September 4 hearing, Plaintiff was told that she would receive written notice of Nuckolls' decision within 10 business days.  After that deadline passed with no statement from MHA, Plaintiff's counsel contacted MHA on September 24, 2014, to request the status of the hearing decision.  After the request by Plaintiff's counsel, MHA mailed out written notice of Nuckolls' decision on September 25, 2014—six days late and in violation of MHA's own policy.[3]  A copy is attached as Exhibit 5.

56.     The hearing decision upheld the termination of Plaintiff's Section 8 Housing benefits. The decision stated, "You attempted to pay your August 2014 rent of $303 late however owner refused to accept it. MHA has no written agreement between you and the owner substantiating there was a mutual agreement to pay your rent late." Exh. 5. Contrary to this statement, Plaintiff's hearing file contained a copy of Exhibit 1, in which the Landlord agreed to deduct the balance of Plaintiff's rent from her security deposit. Additionally, the hearing decision

---

[3] This calculation considers that MHA is closed every other Friday. During the time period at issue here, MHA was closed on Friday, September 12. *See* http://lrhousing.org/about/info.php (last visited October 24, 2014). Counting from September 4, and excluding Saturdays, Sundays, and September 12, the tenth day fell on September 19. MHA thus sent the final decision six days (or four business days) late.

noted that it was based on the violation of a "Family Obligation under the program as listed in CFR 982.551" and admonished Plaintiff that "[n]ot paying rent in accordance with your lease agreement is a serious violation of your lease." Exh. 5.

57.     MHA failed to pay Plaintiff's Section 8 benefits while its final written decision was pending. MHA only paid those benefits later, after Plaintiff's counsel interceded.

58.     Plaintiff's counsel appealed Nuckolls' final decision to the MHA Board of Commissioners through a demand letter sent September 29, 2014, seeking to overturn MHA's termination of Plaintiff's housing assistance. Exhibit 6. The demand letter was addressed to and mailed individually to Defendant Forte and to each Commissioner.

59.     Neither Plaintiff nor Plaintiff's counsel ever received a response from Defendant Forte or the Board of Commissioners.

60.     The deprivation of Section 8 Housing assistance has caused Plaintiff harm. Specifically, she has been deprived of rent subsidies that she would have received but for MHA's wrongful termination of her benefits.

61.     Plaintiff, her daughter, and her granddaughter are currently homeless. They have placed their personal property in a rented storage unit. Plaintiff and her daughter are staying with friends on a tenuous basis, while her granddaughter is staying with Plaintiff's other daughter and grandchildren.

### III.    Termination of Section 8 Housing May Only Occur in Compliance With Federal Law and Due Process

62.     Plaintiff and other Section 8 Program participants have a property interest in their Section 8 Housing vouchers that is protected by the due process guarantees of the United States Constitution.

63.     The Housing Act of 1937 ("Housing Act") and its implementing regulations govern the obligations of Section 8 Program participants and the termination of Section 8 program benefits.

64.     Specifically, under 42 U.S.C. § 1437f(o)(7), an owner cannot provide Section 8 housing without agreeing that "the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause."

65.     Additionally, 42 U.S.C. § 1437d(k) requires housing authorities such as the MHA to adopt certain administrative grievance procedures:

> Administrative grievance procedure regulations; grounds of adverse action, hearing, examination of documents, representation, evidence, decision; judicial hearing. The Secretary shall by regulation require each public housing agency receiving assistance under this Act to establish and implement an administrative grievance procedure under which tenants will—
>
> (1) be advised of the specific grounds of any proposed adverse public housing agency action;
>
> (2) have an opportunity for a hearing before an impartial party upon timely request within any period applicable under subsection (l);
>
> (3) have an opportunity to examine any documents or records or regulations related to the proposed action;
>
> (4) be entitled to be represented by another person of their choice at any hearing;
>
> (5) be entitled to ask questions of witnesses and have others make statements on their behalf; and
>
> (6) be entitled to receive a written decision by the public housing agency on the proposed action.

66.     The rights conferred in these statutes are further elaborated in 24 C.F.R. §§ 982.551 - 982.555.

67.     A Public Housing Agency such as MHA may only terminate a participant's Section 8 Program benefits under the conditions enumerated in 24 CFR § 982.552(c)(1).[4]

68.     Per 24 C.F.R. § 982.552(c)(1)(i), benefits may be revoked if a family violates the obligations outlined in 24 C.F.R. § 982.551.

69.     24 C.F.R. § 982.551(e) prohibits violations of the Section 8 benefit recipient's lease, stating that "[t]he family may not commit any serious or repeated violation of the lease."

70.     In turn, 24 C.F.R. §§ 982.301 – 982.317 address a Section 8 beneficiary's lease. 24 C.F.R. 982.311(b) specifically addresses how benefits may be terminated when a tenant violates the lease by not paying rent:

> Termination of payment: When owner terminates the lease. Housing assistance payments terminate when the lease is terminated by the owner in accordance with the lease. *However, if the owner has commenced the process to evict the tenant, and if the family continues to reside in the unit, **the PHA must continue to make housing assistance payments to the owner in accordance with the HAP contract until the owner has obtained a court judgment or other process allowing the owner to evict the tenant.*** The PHA may continue such payments until the family moves from or is evicted from the unit.

---

[4] Specifically, benefits can be terminated "(i) If the family violates any family obligations [articulated in 24 C.F.R. § 982.551]...; (ii) If any member of the family has been evicted from federally assisted housing in the last five years; (iii) If a PHA has ever terminated assistance under the program for any member of the family; (iv) If any member of the family has committed fraud, bribery, or any other corrupt or criminal act in connection with any Federal housing program...; (v) If the family currently owes rent or other amounts to the PHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act; (vi) If the family has not reimbursed any PHA for amounts paid to an owner under a HAP contract for rent, damages to the unit, or other amounts owed by the family under the lease; (vii) If the family breaches an agreement with the PHA to pay amounts owed to a PHA, or amounts paid to an owner by a PHA. (The PHA, at its discretion, may offer a family the opportunity to enter an agreement to pay amounts owed to a PHA or amounts paid to an owner by a PHA. The PHA may prescribe the terms of the agreement.); (viii) If a family participating in the FSS program fails to comply, without good cause, with the family's FSS contract of participation; (ix) If the family has engaged in or threatened abusive or violent behavior toward PHA personnel; (x) If a welfare-to-work (WTW) family fails, willfully and persistently, to fulfill its obligations under the welfare-to-work voucher program; (xi) If the family has been engaged in criminal activity or alcohol abuse as described in § 982.553."

(Emphasis added).

71.     Additionally, under 24 C.F.R § 982.555, Public Housing Agencies (such as MHA) must follow specified procedures before terminating Section 8 benefits. The required procedures include prompt and adequate written notice of the reason for termination, opportunity for a hearing at which the participant may present evidence and question witnesses, and a prompt, written post-hearing decision regarding termination.

72.     MHA's failure to abide by the Housing Act and its implementing regulations has caused the displacement of almost 1,000 families within the past three years alone.

73.     Defendants engaged (and continue to engage) in a pattern and practice of terminating Section 8 housing benefits immediately upon receipt of a notice to vacate. However, federal law mandates that they must wait until a judicial order evicting the tenant is presented.

74.     Further, Defendants provide critically flawed notice as to why such benefits are being terminated, placing families who wish to challenge their terminations at a tremendous disadvantage.

75.     Finally, MHA conducts hearings in a manner that evidences complete contempt for Section 8 participants. If a notice to vacate is in the beneficiary family's file, MHA views this as dispositive. Any attempt by the family to change the hearing officer's mind is futile—even when, as in Plaintiff's case, the evidence *overwhelmingly proves* that the Section 8 participant has not violated *any* obligation under the program.

76.     MHA's contempt for the statutory and constitutional rights of Plaintiffs and Class Members—the very families that they are hired to serve—is systemic.   Absent class-action litigation, such practices will continue to plague Arkansas's most vulnerable citizens, robbing them not only of their protections under the law, but also of their very homes.

## CLASS ALLEGATIONS

77.    Plaintiff brings this action, individually and on behalf all others similarly situated pursuant to Federal Rule of Civil Procedure 23, for declaratory judgment, injunctive relief, monetary restitution (plus interest), costs, and attorney's fees.  Plaintiff seeks certification for the following Class and Subclass (collectively, the "Classes"):

> **Improper Termination Class ("Class"):** All Section 8 benefit recipients whose benefits were terminated by Defendants on the basis of a notice to vacate, within the three years preceding the filing of this action.

> **Improper Hearing Subclass ("Subclass"):** All Section 8 benefit recipients whose benefits were terminated by Defendants on the basis of a notice to vacate and who subsequently sought a pre-termination hearing, within the three years preceding the filing of this action.

78.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes as discovery progresses and before the Court determines whether certification is appropriate.

79.    Excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers and directors, any entity in which Defendants have a controlling interest, all parties who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

80.    The members of the Classes are so numerous that joinder is impractical.  The Classes consists of at least hundreds of families.   On October 24, 2014, undersigned counsel sent a Freedom of Information Act request to MHA, seeking all MHA terminations of Section 8 housing benefits from October 24, 2011 through October 24, 2014, based on receipt of a notice to vacate. MHA's employee, Marshall Nash, informed Plaintiff's counsel that there were 964 terminations within this period. *See* Decl. of John C. Williams, Exh. 7. While that number only

identifies the Class (families whose Section 8 benefits were terminated as a result of a notice to vacate) and not the Subclass (families who then appealed those terminations), it would require appeals from only a single-digit percentage of the 964 terminations to satisfy the numerosity requirement for the Subclass. The identities of the members of the Classes, upon information and belief, are within MHA's knowledge and can be ascertained by resort to MHA's records.

81.    The claims of the representative Plaintiff are typical of the claims of the Classes, in that they result from Defendants' policies and procedures governing (1) the decision to terminate Section 8 housing benefits upon receipt of a notice to vacate from beneficiaries' landlords and (2) appeals from these terminations. Plaintiff, like all members of the Improper Termination Class, had her Section 8 housing voucher terminated by MHA in violation of her rights under the United States Constitution and the Housing Act and its implementing regulations. Similarly, Plaintiff, like all members of the Improper Hearing Subclass, was subjected to a pre-termination hearing that violated her rights under the United States Constitution and the Housing Act and its implementing regulations. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other member of the Classes.

82.    There are questions of law and fact common to the Class. Common questions include, but are not limited to, the following:

a.    Whether Defendants engage in a pattern and practice of terminating Section 8 housing benefits solely on the basis of receiving a notice to vacate from beneficiaries' landlords;

b.   Whether such conduct violates the procedural due process rights of Plaintiff and Class Members, as guaranteed by the Fourteenth Amendment to the United States Constitution;

c.   Whether such conduct violates the substantive due process rights of Plaintiff and Class Members, as guaranteed by the Fourteenth Amendment to the United States Constitution;

d.   Whether such conduct violates 24 C.F.R. § 982.311(b);

e.   Whether Defendants' policies and procedures with regard to providing written notice of termination of benefits to Plaintiff and Class Members violate the procedural due process rights of Plaintiff and Class Members, as guaranteed by the Fourteenth Amendment to the United States Constitution;

f.   Whether Defendants' policies and procedures with regard to providing written notice of termination of benefits to Plaintiff and Class Members violate 24 C.F.R. § 982.555(c)(2)(i);

g.   Whether Defendants' policies and procedures with regard to pre-termination hearings—specifically, those policies and procedures in which Defendants fail to consider evidence or permit cross-examination of witnesses—violate the procedural due process rights of Plaintiff and Class Members, as guaranteed by the Fourteenth Amendment to the United States Constitution;

h.   Whether Defendants' policies and procedures with regard to pre-termination hearings—specifically, those policies and procedures in which Defendants fail to consider evidence or permit cross-examination of witnesses—violate 24 C.F.R. § 982.555(e)(5);

i.   Whether Defendants' policies and procedures with regard to pre-termination hearings—specifically, those policies and procedures in which Defendants fail to base decisions upon evidence presented at the pre-termination hearings—violate the procedural due process rights of Plaintiff and Class Members, as guaranteed by the Fourteenth Amendment to the United States Constitution;

j.   Whether Defendants' policies and procedures with regard to pre-termination hearings—specifically, those policies and procedures in which Defendants fail to base decisions upon evidence presented at the pre-termination hearings—violate 24 C.F.R. § 982.555(e)(6);

k.   Whether Defendants' policies and procedures with regard to producing written decisions following pre-termination hearings violate the procedural due process rights of Plaintiff and Class Members, as guaranteed by the Fourteenth Amendment to the United States Constitution; and

l.   Whether Defendants' policies and procedures with regard to producing written decisions following pre-termination hearings violate 24 C.F.R. § 982.555(e)(6).

83.   Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

84.   A class action is maintainable under Rule 23(b)(2). The policies and practices of Defendants complained of herein are systemic. Thus, the representative Plaintiff, like all other members of the Classes, has been injured and faces substantial risk of the same injury in the future. The factual basis of Defendants' misconduct is common to all members of the Classes

and represents a common thread of conduct resulting in injury to all members of the Classes. Therefore, injunctive and declaratory relief is appropriate respecting the Classes as a whole.

85.     A class action is also maintainable under Rule 23(b)(3). The common questions enumerated above predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Pursuant to HUD regulations, recipients of Section 8 housing assistance are indigent. 24 C.F.R. § 982.201(b). Accordingly, no Class Members could afford to seek legal redress individually for the claims alleged herein. To the extent that individual Class Members could avail themselves of legal aid services such as the Center for Arkansas Legal Services, the opportunity for any appreciable percentage of the Classes to obtain relief would tax such organizations' resources to the utmost, as Defendants' pattern and practice of illegally terminating Section 8 housing benefits has affected almost one thousand families in the Class Period alone.   Therefore, absent a class action, the Class Members will continue to suffer losses and Defendants' misconduct will proceed without remedy.

86.     Even if Class Members themselves could afford such individual litigation, the court system could not.  Given that almost one thousand households have had their benefits impermissibly terminated within the Class Period, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

23

**COUNT ONE**
**Wrongful Termination of Benefits Immediately upon Receipt of a Notice to Vacate**
*Individual and Class Claim for Violation of Procedural Due Process*

87.    Plaintiff realleges and incorporates by reference all the allegations contained in the paragraphs above.

88.    Plaintiff and Class Members have a property interest in their Section 8 vouchers.

89.    Due process requires that Plaintiff and Class Members be provided a meaningful opportunity to challenge MHA's decision to terminate Section 8 benefits.

90.    MHA's stated policy is to terminate a housing choice voucher as soon as a landlord sends a copy of a notice to vacate to MHA.  The decision to terminate is automatic, occurring before any court process has been *filed*, much less before a court of law has found against the accused tenant.

91.    As revealed through Plaintiff's informal hearing, any attempt by a Section 8 beneficiary to appeal a termination of benefits on the basis of a notice to vacate is futile. Landlords are not required to be present at pre-termination hearings, and thus Plaintiff and Class Members are robbed of the opportunity to directly challenge this hearsay evidence, which Defendants treat as dispositive.  Instead, Plaintiff and Class Members may only tell their version of the events which, according to Nuckolls' and Nash's representations, can never overcome the "four corners" of the notice to vacate.  Thus, Plaintiff and Class Members have no meaningful opportunity to challenge MHA's termination decision.

92.    By failing to provide a meaningful opportunity to challenge its termination decision, MHA deprived Plaintiff and Class Members of the procedural due process guaranteed by the Fourteenth Amendment to the United States Constitution.

**COUNT TWO**
**Wrongful Termination of Benefits Immediately upon Receipt of a Notice to Vacate**

*Individual and Class Claim for Violation of Substantive Due Process*

93.     Plaintiff realleges and incorporates by reference all the allegations contained in the paragraphs above.

94.     MHA deprived Plaintiff and Class Members of property by terminating their Section 8 vouchers.

95.     MHA's stated policy is to terminate a housing choice voucher as soon as a landlord sends a copy of a notice to vacate to MHA.  The decision to terminate is automatic, occurring before any court process has been *filed*, much less before a court of law has found against the accused tenant. Indeed, to date, Plaintiff has emerged from two separate legal proceedings *without* a judicial determination that she has violated Arkansas's criminal failure-to-vacate law.

96.     MHA's sole justification for terminating Plaintiff's and Class Members' Section 8 vouchers is receipt of a notice to vacate from a landlord. This justification is inadequate, arbitrary, and capricious.

97.     Terminating Section 8 benefits based solely on a notice to vacate bears no rational relationship to the purposes of the Section 8 program.

98.     MHA's arbitrary termination of Plaintiff's and Class Members' property interest has deprived them of the substantive due process guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT THREE
**Wrongful Termination of Benefits Immediately upon Receipt of a Notice to Vacate**
*Individual and Class Claim for Violation of 24 C.F.R. § 982.311(b)*

99.     Plaintiff realleges and incorporates by reference all the allegations contained in the paragraphs above.

100.   MHA's stated policy is to terminate a housing choice voucher as soon as a landlord sends a copy of a notice to vacate to MHA.  The decision to terminate is automatic, occurring before any court process has been *filed*, much less before a court of law has found against the accused tenant.  Indeed, to date, Plaintiff has emerged from two separate legal proceedings *without* a judicial determination that she has violated Arkansas's criminal failure-to-vacate law.

101.   Further, MHA's stated reasons for Plaintiff's termination are that "[n]ot paying rent in accordance with your lease agreement is a serious violation of your lease," and that such behavior violates the recipient's family obligations under 24 C.F.R. 982.551.  Exh. 5.  In reality, HUD regulations state that housing authorities such as MHA *may not* terminate housing assistance "*until the owner has obtained a court judgment or other process allowing the owner to evict the tenant.*" 24 C.F.R. § 982.311(b) (emphasis added).

102.   MHA violated 24 C.F.R. § 982.311(b) by terminating Plaintiff's and Class Members' benefits immediately upon receipt of a notice to vacate and without a court judgment allowing the owner to evict the tenant.

## COUNT FOUR
### Failure to Provide Sufficient Notice of Termination
### *Individual and Class Claim for Violations of Procedural Due Process and*
### *24 C.F.R. § 982.555(c)(2)(i)*

103.   Plaintiff realleges and incorporates by reference all the allegations contained in the paragraphs above.

104.   The federal regulations governing MHA, and specifically governing the termination of voucher assistance, require that MHA provide "prompt written notice" containing a "statement of reasons for the decision" and permitting the decision to be challenged at an

informal hearing. 24 C.F.R. § 982.555(c)(2)(i). The written notice must sufficiently describe the ground for termination so that the beneficiary may prepare for the informal hearing.

105.    The sole reason that MHA gave for termination of Plaintiff's benefits was "Ten day Eviction Notice to vacate for back rent owed in the amount of $303 for August." Exh. 3. This ground failed to put Plaintiff on sufficient notice of the basis for her termination. It did not identify the regulatory ground for termination of benefits, nor did it adequately represent the substance of MHA's charges at the hearing.

106.    Additionally, the notice of termination does not intelligibly inform Plaintiff of her right to present witnesses at the hearing. Instead, the notice says, "You have the right to have legal counsel and witnesses **from** present at the hearing." (Emphasis original.)

107.    Upon information and belief, the notice received by Plaintiff is substantially similar in form and substance to the notice sent to all Class Members.

108.    By failing to provide the adequate notice required by 24 C.F.R. § 982.555(c)(2)(i), MHA violated Plaintiff's and Class Members' procedural due process rights, guaranteed by the Fourteenth Amendment to the United States Constitution.

### COUNT FIVE
**Failure to Permit Evidence and Cross-examination of Witnesses**
*Individual and Subclass Claim for Violations of Procedural Due Process*
*and 24 C.F.R. § 982.555(e)(5)*

109.    Plaintiff realleges and incorporates by reference all the allegations contained in the paragraphs above.

110.    When a Section 8 Program participant requests an informal hearing, she "must be given the opportunity to present evidence, and may question any witnesses." 24 C.F.R. § 982.555(e)(5).

111.    At Plaintiff's informal hearing, Nuckolls refused to consider evidence outside the four corners of the notice to vacate. Based solely on that document, Nuckolls found that Plaintiff had failed to pay rent and decided to terminate her benefits.

112.    The Landlord's word provided the sole basis for the notice to vacate. However, Plaintiff was not afforded the opportunity to question the Landlord, and Nuckolls stated that she would not consider the Landlord's testimony in any case.

113.    Besides the notice to vacate, MHA offered no other evidence to corroborate the truth of the assertion that Plaintiff had failed to timely pay rent.

114.    Defendants have no subpoena power to compel landlords to be present at informal hearings, thus neither Plaintiff nor Subclass Members were granted an opportunity to challenge the truth of the assertion in the notice to vacate. Furthermore, as stated at Plaintiff's hearing, it is MHA's pattern and practice to refuse to believe any contradictory testimony offered by Plaintiff or Subclass Members that challenges the "four corners" of the notice to vacate.

115.    By failing to permit Plaintiff and Subclass Members to present evidence and to cross-examine witnesses as provided by 24 C.F.R. § 982.555(e)(5), MHA violated Plaintiff's and Subclass Members' procedural due process rights, guaranteed by the Fourteenth Amendment to the United States Constitution.

### COUNT SIX
**Failure to Base Decision upon Evidence Presented at Hearing**
***Individual and Subclass Claim for Violations of Procedural Due Process
and 24 C.F.R. § 982.555(e)(6)***

116.    Plaintiff realleges and incorporates by reference all the allegations contained in the paragraphs above.

117.    When a Section 8 Program participant requests an informal hearing, the hearing officer's decision "shall be based on a preponderance of the evidence presented at the hearing." 24 C.F.R. § 982.555(e)(6).

118.    At the hearing, Plaintiff offered testimony that she and the Landlord had arranged for payment of her August rent after the time that it would otherwise be due.

119.    Plaintiff's hearing file, which Nuckolls had in her possession, contained a document dated August 4, 2014, in which the Landlord agreed to take Plaintiff's August rent from her security deposit, thus satisfying her August rent obligation.

120.    Plaintiff's counsel repeatedly tried to present evidence of (1) Plaintiff's history of being a model tenant and (2) the adverse impact that termination would have on Plaintiff, given her exceptionally limited income.

121.    At the hearing, Nuckolls refused to consider these items of evidence, to state the applicable burden of proof, or even to articulate which party bore the burden of proving that there was a proper ground for terminating Plaintiff's Section 8 voucher. Instead, she based her decision on the "four corners" of the notice to vacate and nothing more.

122.    Despite the evidence that the Landlord had agreed to payment of rent via Plaintiff's security deposit, Nuckolls' final written decision stated that "MHA has no written agreement between you and the owner substantiating there was a mutual agreement to pay your rent late." Exh. 5. This is demonstrably false, as the information at the top of Exhibit 1 shows that the document detailing the agreement between Plaintiff and Landlord was faxed to MHA at 9:54 on August 4, 2014.

123.    By failing to base its final termination decision on a preponderance of the evidence presented at the hearing, as required by 24 C.F.R. § 982.555(e)(6)—indeed, by failing

even to *consider* evidence outside the "four corners" of the notice to vacate—MHA violated Plaintiff's and Subclass Members' procedural due process rights, guaranteed by the Fourteenth Amendment to the United States Constitution.

**COUNT SEVEN**
**Failure to Provide Impartial Hearing Officer**
***Individual Claim for Violation of Procedural Due Process***

124.    Plaintiff realleges and incorporates by reference all the allegations contained in the paragraphs above.

125.    At the informal hearing, the hearing officer refused to articulate which party had the burden of proof and could not identify the regulatory provision under which Plaintiff's benefits were terminated. Instead, she repeatedly stated that benefits were being terminated for receipt of the notice to vacate, which is not an enumerated basis for termination of benefits in the federal regulations and is instead a basis that is in direct conflict with 24 C.F.R. § 982.311(b).

126.    Federal regulations contemplate that the hearing officer will have flexibility to consider mitigating circumstances in individual cases. In determining whether to terminate benefits, MHA is permitted to "consider all relevant circumstances such as the seriousness of the case, the extent of participation or culpability of individual family members, mitigating circumstances related to the disability of a family member, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure." 24 C.F.R. § 982.552(c)(2).

127.    Nuckolls refused to consider any mitigating circumstances. Nor did she consider other evidence favorable to Plaintiff. Instead, she relied solely on the notice to vacate while repeatedly making statements that favored MHA's position. Nuckolls impermissibly served the dual roles of advocate and adjudicator in the pre-termination hearing.

128.   Further, Nash was improperly involved in the hearing as both an advocate and an effective hearing officer. As evidenced by the transcript of the hearing, Nash frequently stepped into Nuckolls' shoes even as he was taking MHA's position.

129.   MHA's actions at the informal hearing deprived Plaintiff of an impartial decisionmaker and violated Plaintiff's procedural due process rights, as guaranteed by the Fourteenth Amendment to the United States Constitution.

### COUNT EIGHT
**Failure to Issue a Timely and Adequate Written Decision after Informal Hearing**
***Individual and Subclass Claims for Violations of Procedural Due Process and***
***24 C.F.R. § 982.555(e)(6)***

130.   Plaintiff realleges and incorporates by reference all the allegations contained in the paragraphs above.

131.   Federal regulations require that "[t]he person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision." 24 C.F.R. § 982.555(e)(6).

132.   Nuckolls' decision fails to sufficiently explain why Plaintiff's voucher was terminated. As a legal ground for termination, the decision stated only (and incoherently), "If any family member violates any Family Obligation under the program as listed in 24 CFR 982.551." The decision does not further identify the "Family Obligation" that Plaintiff violated or otherwise discuss the basis for terminating Plaintiff's Section 8 voucher.

133.   The written decision also stated that "MHA has no written agreement between you and the owner substantiating there was a mutual agreement to pay your rent late." This statement is demonstrably false. Plaintiff's hearing file contained such a written agreement. The information at the top of Exhibit 1 shows that the document detailing the agreement between Plaintiff and Landlord was faxed to MHA at 9:54 on August 4, 2014.

134.    Additionally, federal regulations provide that "[a] copy of the hearing decision shall be furnished promptly to the family." 24 C.F.R. § 982.555(e)(6).

135.    MHA promised Plaintiff a written decision within ten business days of the September 4 hearing but failed to provide it within that time.

136.    In light of Plaintiff's and Subclass Members' limited resources and the significant financial burden caused by MHA's termination of benefits, any delay in receipt of a final decision causes irreparable harm. In Plaintiff's circumstances, for instance, MHA failed to pay benefits during the pendency of the final decision, thereby exposing her to reprisal from her landlord and criminal process.

137.    Upon information and belief, the notice received by Plaintiff is substantially similar in form and substance to the notice sent to all Subclass Members.

138.    By failing to provide a timely written decision adequately informing Plaintiff and Subclass Members of the ground for terminating benefits, as required by 24 C.F.R. § 982.555(e)(6), MHA violated Plaintiff's and Subclass Members' procedural due process rights, guaranteed by the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members respectfully ask this Court to:

A.    determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure; that Plaintiff is a proper representative for the Classes; and that the best practicable notice of this action be given to members of the Classes represented by Plaintiff;

B.    issue a preliminary injunction reinstating Plaintiff's Section 8 housing voucher;

C.      issue a permanent injunction to enjoin Defendants from terminating Section 8 benefits solely on the basis of a notice to vacate;

D.      issue a permanent injunction requiring Defendants to follow federal regulations and due process requirements in the conduct of pre-termination hearings;

E.      issue a permanent injunction reinstating Plaintiff's and Class Members' Section 8 Housing vouchers;

F.      enter an order for payment of monetary restitution, including prejudgment and postjudgment interest, to Plaintiff and Class Members of 100% of the Section 8 housing voucher payments that Defendants improperly terminated;

G.      enter a judgment declaring that the acts complained of herein violate federal regulations and the Fourteenth Amendment to the United States Constitution;

H.      award Plaintiff her attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

I.      grant such other relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff and Class Members hereby request a trial by jury all issues so triable.


Dated: November 3, 2014                 Respectfully submitted,


                                        /s/ David Slade
                                        David Slade (Ark. Bar No. 2013143)
                                        John C. Williams (Ark. Bar. No. 2013233)
                                        Hank Bates (Ark. Bar No. 98063)
                                        CARNEY, BATES & PULLIAM, PLLC
                                        11311 Arcade Drive, Suite 200
                                        Little Rock, AR 72212
                                        Telephone: (501) 312-8500
                                        Fax: (501) 312-8505
                                        dslade@cbplaw.com
                                        jwilliams@cbplaw.com
                                        hbates@cbplaw.com

33

*Attorneys for Plaintiff*

# EXHIBIT 1

08/04/2014 09:54    5013404714             LRHA                    PAGE  02/02

## AUTHORIZATION FOR MUTUAL RESCISSION OF SECTION 8 LEASE

TENANT NAME: BRENDA GLOVER

UNIT ADDRESS: 1414 W. 11TH STREET

CITY: LITTLE ROCK, AR        ZIP CODE: 72202

TERMINATION DATE OF CURRENT LEASE: AUGUST 31, 2014

OWNER NAME: CHAD WILLIAMS, DIRECTOR OF LEASING

Authorization is hereby given to terminate the Section 8 Lease between the above named parties,

effective AUGUST 31, 2014 .

The tenant's account, including rent charges is current _____ yes ___✓___ no.

If tenant's account is delinquent, please itemize charges and amounts.

$303.00 - August Rent (tenant portion)

**************************

The tenant has been advised that the Housing Authority of the City of Little Rock CANNOT continue the housing assistance payment at another unit unless this authorization is secured and the account is current and verified by the landlord.

IN THE EVENT THE TENANT DOES NOT VACATE THE UNIT BY THE EFFECTIVE DATE, THE TENANT IS RESPONSIBLE FOR THE RENT. EXTENSIONS OF THIS NOTICE MAY BE CONSIDERED UPON WRITTEN DOCUMENTATION FROM THE LANDLORD AND TENANT.

_____          * 8/4/14
OWNER/ MANAGER SIGNATURE              DATE

Brenda L. Glover                  8/06/14
TENANT'S SIGNATURE                   DATE

✱ Rental Realty is releasing Brenda Glover from her current lease ✱ Her outstanding balance owed will be paid with her security deposit that she put down.

# EXHIBIT 2


**RENTAL
REALTY**
WWW.RENTALREALTYAR.COM

08/11/2014

# Notice To Vacate
## Ten (10) Day Eviction Notice

Property Name: 1414 W 11th

Resident Name(s):
Brenda Glover

1414 W 11th
Little Rock, AR 72202

You are hereby notified to quit and demand is hereby made that you surrender possession of the premises now occupied by you at the above address. Renter(s) owe back due rent in the amount of ~~$247.00~~ (Not including fees or other balances, as of this date). *$303.00*

Owner(s) / Agents(s): **Rental Realty, Inc.**

Owner(s) and/or Agents(s), on or before ten (10) days after service of the notice to you; otherwise, you may be ejected under and according to Arkansas law, or prosecuted under the criminal law of the State of Arkansas.

Make Payment to Rental Realty, Inc: *400 N Van Buren*
ADDRESS: ~~10201 W Markham Ste 108~~, Little Rock, AR. 72205
EMAIL: evictioninfo@rentalrealtyar.com

On 08/11/2014, I duly served this notice to vacate by delivering a true copy to Brenda Glover at the usual place of abode, in person in Pulaski County, Arkansas.

_____
Server's Signature

_____
Witness's Signature

# EXHIBIT 3



**MHA**
**METROPOLITAN HOUSING ALLIANCE**
GIVING EVERY STREET A NEIGHBORHOOD.
MAKING EVERY HOUSE A HOME.

**Housing Choice Voucher Program**
**100 South Arch St., Little Rock, AR 72201**

August 12, 2014

Brenda L. Glover
1414 W. 11th Street
Little Rock, AR 72202

RE: Termination of Housing Assistance Payments

Dear Ms Glover,

This letter is to advise you that a review of your tenant file indicates that you have not complied with the requirements of the housing choice voucher program. Specifically:

- **Ten day Eviction Notice to vacate for back rent owed in the amount of $303 for August**

As a result of your failure to comply with the above stated requirements, your assistance is terminated effective **August 27, 2014.**

 If you wish to appeal this decision, you have the right to an informal hearing. You have the right to have legal counsel and witnesses **from** present at the hearing.  **The request for appeal must be submitted in writing to the MHA office using the Request for an Informal Hearing form, available at the front desk, no later than September  12, 2014, ten (10) business days from the date of this letter.** The informal hearing will be scheduled within 14 calendar days from the date of receipt of the completed request form. If your request is not received within the time period indicated above, you will waive your right to a hearing and our decision to terminate your assistance will become final. This does not, however, constitute a waiver of your rights to appropriate judicial proceedings.

Should you choose to remain in occupancy after the effective date of your termination, you will be responsible for paying the full amount of rent to the owner.

Sincerely, *Cheryl Roberson*
Cheryl Roberson



**(501) 340-4821 (phone)**      **(501) 340-4714 or 340-4827 (fax)**      **www.mhapha.org**

# EXHIBIT 4

# CERTIFICATION

I, Sandra Fleming, Transcriptionist for the Arkansas Board of Review, hereby certify that

I have transcribed from digital recording, to the best of my ability, all of the testimony in

the hearing involving HCV participant, Brenda Glover, and the Housing Authority, held

in person on September 4, 2014 in Little Rock, Arkansas, before Asonja Nuckolls,

Hearing Officer.  All of said testimony and proceedings therein have been transcribed by

me and are set forth in the document attached hereto.


Dated at Little Rock, Arkansas, the 13th day of October, 2014.


Sandra Fleming
Transcriptionist

*The following is a transcript of an informal hearing recorded September 4, 2014:*

Nuckolls:   Good afternoon. This is an informal hearing for Ms. Brenda Glover.

            Attending the hearing is Hearing Officer, Asonja Nuckolls; Housing

            Specialist, Cheryl Roberson; Administrative Services Director, Marshall

            Nash; HCV participant, Brenda Glover; Attorney Josilynn (sic) Bell.

Bell:       Joycelyn.

Nuckolls:   Joycelyn Bell, excuse me, and Attorney Dustin Duke. Okay. Okay, Ms.

            Glover, I understand that you were served a 10-day eviction notice for

            non-payment of rent. Would you like to talk to me about that?

Duke:       Can I interject, first of all?

Nuckolls:   Sure.

Duke:       Our position is that the Housing Authority has the burden of persuasion

            and that they would have to present evidence first showing why her

            voucher is being terminated.

Nuckolls:   Okay.

Duke:       And if they present sufficient evidence to that, of course, we have the

            burden of, of rebutting that.

Nuckolls:   Okay. Did you guys come and make copies of the documentation that

            substantiated why we were terminating her?

Duke:       We had a chance to make copies of the file and we did that, but that

            doesn't necessarily mean that we have the burden of going forward to

            prove that we did not violate the voucher. The Housing Authority still has a

1

|  | burden of proving why her voucher is being terminated.  But before we even begin that I'd like to know |
|---|---|
| Nuckolls: | Okay |
| Duke: | under what specifically what regulation she's being terminated under, if we, if we… |
| Nuckolls: | Okay.  She's being terminated – I can't cite the exact regulation.  If you want to know like the CFR 92 whatever… |
| Duke: | If you don't know the exact… |
| Nuckolls: | …that I don't have. |
| Duke: | … at least the reason; the exact reason for being… |
| Nuckolls: | Okay.  The exact reason is the participants have family obligations that they must abide by.  One of the family obligations is that they must pay their portion of the rent timely and abide by their lease. And paying the rent timely or in opposite not paying the rent timely would be a violation of her family obligations for which she signed a form, you know, stating that she understands her family obligations which is rent must be paid timely. |
| Duke: | Well then I think I'm going to have to raise the issue that she was not provided proper notice as to why her voucher is being terminated because what we have been told and what – the way I read the notice is that she was terminated because she was evicted from the house – from the unit by the landlord and if that's not the reason why she's… |
| Nash: | Asonja, let me, let me—can I interrupt here? |
| Nuckolls: | Sure. |

2

Nash:      Ask you a question.  What is your normal procedure and is there a time for

           them to just speak independently, like in summary or something like that?

Nuckolls:  This is actually my first hearing with an attorney so …

Nash:      No, I mean just your normal procedure. What—is there a process whereby

           you have them explain, or you ask questions…

Nuckolls:  Yes….

Nash:      …and then…

Nuckolls:  …that's correct.

Nash:      I would suggest that we just go through that – your – I understand your

           position.  Your argument is so noted but let her go ahead and go through

           her process and then whatever argument you have, when we get to the

           end, just make it and it will be on the record.  So, because otherwise I can

           see us not getting through this because it seems like, honestly, preparing

           for a fight. We ain't here to fight. We're just here to give her an opportunity

           to be heard. But we hadn't – we can't get to that if counsel is gonna, you

           know. So let's – but you're going to get a chance to – I know you worked

           on it; can't wait to hear it.  But let's let her go through her process.

Duke:      That's fine, but for the record again, we should be clear on what the

           procedure is and why she's being terminated, right?

Nuckolls:  Sure, I can explain that.

Duke:      That should be a clear understanding and then I'm fine to let her go

           through the process and I'll make…

3

Nash:          Right. And I think she answered that question when you said just tell us what it was. She told you what it was and then you had something to say beyond that. So now you know what it is but let her go ahead and go through her process and then when she gets to the point where, say, the floor is yours, just take off. Okay? So go ahead. Go ahead, Asonja.

Nuckolls:      Okay. Just for clarity purposes, Ms. Glover, you were terminated and you received written notice of your termination because you received a 10-day eviction notice to vacate for back rent owed in the amount of Three Hundred and Three dollars ($303.00) for August. We also received an additional letter dated 9/3/2004 stating that the balance is now Six Hundred and Six dollars ($606.00). But specifically, the letter you received states you're being evicted, for a 10-day eviction notice to vacate unit for back rent owed in the amount of Three Hundred and Three dollars ($303.00). Would you like to speak to that, please?

Glover:        Yes. I called him, I called him on like the 6th of August letting him know that I was going to be late and he said fine. Will you have it by the 11th? I said I'll probably have it by the 13th, and I called him on the 13th and he told me he didn't want it.

Nuckolls:      He told you when (sic), ma'am?

Glover:        He didn't want it.

Nuckolls:      Okay.

4

Glover:     He said I just want you to lose your voucher since you called the Attorney

            General on my company and had my company investigated so you don't

            deserve to live anywhere.  You just need to be...

Nuckolls:   Okay.  So if I understand correctly, your rent was in fact late.  However,

            you had a conversation with the owner or a verbal agreement with the

            owner that you could pay late.  The owner agreed to it. Then, once you

            tried to pay, he refused your payment.

Glover:     No, he, he refused to – he decided to give me a 10-day notice because I

            called the Attorney General and - because I had asked him about my

            security deposit. And he didn't want to give it to me.  So I told him, I said I

            had to pay for his repairs, you know, and then when, when he got his letter

            from the Attorney General on the 11th, he came out that evening and gave

            me that because he was mad.

Nuckolls:   Okay.

Glover:     Had he not got that letter from the Attorney General, he wouldn't, he

            wouldn't have did that.

Nuckolls:   Ms. Roberson, would you like to speak to this with regard to the

            arrangement or agreement or what happened prior to – maybe in an

            agreement or discussion that Ms. Glover and her owner had regarding the

            rent and payment and an agreement they may have possibly had?

Roberson:   Well the agreement didn't come directly from me.

Nuckolls:   Okay.

Roberson:     It came from - as Ms. Glover was saying she stated she had an
              arrangement to pay the rent.

Nuckolls:     Okay.

Roberson:     Okay. And that what she's saying is that because she went to the
              Attorney General that he served a 10-day eviction notice on her. I didn't
              have that agreement with the landlord. The landlord didn't tell me that.

Nuckolls:     Okay.

Roberson:     The only thing that I received is a 10-day eviction notice.

Nuckolls:     Okay, but you – so, for clarity, you had no knowledge of any arrangement
              that Ms. Glover and the owner …

Roberson:     Yes, only by what Ms. Glover said.

Nuckolls:     Per Ms. Glover?

Roberson:     Yes.

Nuckolls:     Okay.

Roberson:     But not directly with the landlord.

Nuckolls:     Okay. So, according to our policy, once you received the notice you
              proceeded with what our rules are and proceeded with termination and
              sending a letter.

Roberson:     Yes.

Nuckolls:     Based on our policy.

Roberson:     Yes, because I received a letter on August 11. I proceeded on August 12
              through the eviction process based on our family obligations; violation of
              our family obligations.

6

Nuckolls:    Okay.  Mr. Duke, would you like to speak?

Duke:    Well I'd like to question my client some if I could.

Nuckolls:    Absolutely.

Duke:    Thank you.  First of all, are you saying that you planned on paying the rent for August?

Glover:    Yes, I did.

Duke:    And, but for the fact that the landlord gave the 10-day notice to vacate, would you have paid him the rent?

Glover:    Yes. 'Cause I had already told, told him that I was gonna move out by August 31.

Duke:    And you were in the process at the time of getting your voucher transferred?

Glover:    I had it already transferred when he signed off on my lease.

Duke:    Okay.

Glover:    And I picked up my 2-bedroom voucher.

Roberson:    I would say that the voucher was issued.  It wasn't transferred or it wasn't leased up.  It was issued.

Duke:    Okay.

Roberson:    And there is a difference.

Duke:    Okay.  So the voucher was issued and you were in the process of transferring, in other words moving into a different…

Roberson:    She was shopping.

Duke:    Okay.  Prior to this had you ever been behind in your rent?

7

Glover:     No sir.

Duke:       Okay. Because of your household size, your rent recently changed, is that
            correct?

Glover:     Yes.   It went from a dollar ($1.00) to Three Hundred and Three dollars
            ($303.00).

Duke:       And you paid the three hundred and three dollars ($303.00) in July?

Glover:     Yes, I did.

Duke:       And you paid on time?

Glover:     Yes, I did.

Duke:       But did that make a difference as far as your ability to pay on time in
            August?

Glover:     Well, it sort of affected my finances because I had to overdraft my bank
            account to get it to pay that rent.  I'm still dealing with overdrafts now so it
            just makes me to have half a check because I only get Seven Hundred
            and forty-six dollars ($746.00) a month.

Duke:       That's your only income is seven hundred and forty six a month?

Glover:     Yes.

Duke:       You have a car note on top of the rent?

Glover:     Yes.

Duke:       Now you did go to court on this notice that the landlord gave you, correct?

Glover:     Yes, I did.

Duke:       It was two days ago.

Glover:     Yes.

8

Duke:       And what was the outcome of that court case?  Little Rock District Court?

Glover:     Null process.

Duke:       It was thrown out by the Judge?

Glover:     Yes sir.

Duke:       I would like to submit this for the record, if we could.

Nuckolls:   Okay.

Duke:       It's a certified copy...

Nuckolls:   Certainly.

Nash:       ...(Inaudible).  So you...I'm allowed to go ahead?

Nuckolls:   Yes.

Nash:       A null pros traditionally means that the prosecutor didn't prosecute; not that the Judge threw it out.  Which one of these occurred?

Duke:       Well actually it was null pros by the prosecution.

Nash:       Okay.

Duke:       It was a null pros by the prosecution.

Nash:       So the Judge didn't hear the merits of this?

Duke:       No.  They never did.

Nash:       Okay.

Duke:       The prosecutor withdrew.

Nash:       Can I ask you, on – you mentioned that you called him on August 13th.  What were you going to tell the landlord on August 13?

Glover:     I was fixing to go take him the money.

Nash:       Okay, you – how much money did you have with you?

9

Glover:      Three hundred and three (303).

Nash:        Okay.

Duke:        I don't have any further questions for Ms. Glover.   I would like to make a
             few points though if it's time for me to do that?

Nuckolls:    Sure.

Duke:        First, of all, again, my understanding both from reading the notice and
             from, see where is that notice here – from reading the notice and talking to
             Ms. Roberson is that Ms. Glover's was being - her voucher is being
             terminated because she was evicted.  If we're here because it's, it's not
             because she was evicted but because she – it was another provision
             under the regulation that she's being terminated for, in this case,
             specifically for non-payment of rent, I would argue that the notice is not
             clear enough, and from my conversation with Ms. Roberson, it's not clear
             enough why we're here to allow us to mount a defense.  I think the notice
             is therefore deficient and that would, that would be a problem with this
             hearing today.  The other thing that does need to be made clear, if we are
             considering the notice at all, and I don't know – at this point it's not clear
             what effect we're considering as far as that notice.  Is that HUD has
             repeatedly said, and I have a memorandum from 1981 where they
             repeatedly said that landlord is not to, or the Housing Authority
             themselves, are not to avail themselves to the Arkansas Criminal  Eviction
             Statute, the criminal statute, which Ms. Glover was charged under based
             on this 10-day notice. And so I would like you all to consider the fact that

the landlord really had no authority based on HUD's posture on

Arkansas's criminal statute on non-payment of rent to even provide her

with this 10-day notice and to use those procedures. So, I understand this

is an older memorandum

Nuckolls:   Yes.

Duke:   but it's never been changed. I have, again, a notice from the Pine Bluff

Housing Authority from 1995 that reiterates it and it's not been – it's not

been modified or changed since the memorandum came into being

because there were some major due process concerns with the Arkansas

criminal statute on failure to pay rent. I'd also like to point out that Ms.

Glover has never been late before in her rent. The only reason she was

late this time as she stated is because her rent substantially changed after

she, her housing size changed. She had made a timely notice to transfer

her voucher. There were some concerns going back and forth with her

and the landlord over whether or not she owed some fees and that that

somewhat delayed the voucher so it would not take – or delayed the

transfer so it would not take effect until the end of August thereby making

her responsible for a higher rent to the landlord in July and August. Of

course, given her obligation on her vehicle and now the Three Hundred

dollars ($300.00) in rent it took up – and other obligations, of course, to

live on, with Seven Hundred dollars ($700.00); Seven Hundred and forty

or thirty dollars being her only source of income, it placed quite a burden

on her ability to pay rent in a timely manner. She did pay it timely in July.

11

She knew she wasn't going to pay timely in August so she talked to the

landlord, as she should have done, and she got an agreement from the

landlord to extend the time to pay.  However, her and the landlord got into

an argument over her security deposit. She contacted the Attorney

General's office as she has a right to do to file a complaint; whether or not

it was justifiable and he took her security deposit justifiably or not, is not at

issue. But she contacted the AG's office to complain about that. The AG

then contacts the landlord, and because of him being contacted by the

Attorney General's office, it upset him and he, therefore rescinded his

verbal agreement and turned around and filed a 10-day notice to vacate

and served her with that and provided you all with that notice. So I would, I

would posit that she shouldn't be punished by losing her voucher based

on the actions of the landlord when he really wasn't acting in good faith in

his, in his dealings with Ms. Glover and that if you look at her history, she's

been a model tenant. She's not had any problems, going back in her file,

since the time she's had this voucher, she never had any other problems

with this landlord as far as payment of rent, or, or being behind in her rent

in the past. And so we're asking that she be allowed to continue her

voucher and, in fact, be allowed to transfer it out because that's what she

intended to do before all of this took place or started. She wants to move

to a more affordable home, of course, because of her new family size.

She wants to move to an accommodating place that would accommodate

her family and be more affordable to her.

Nuckolls:     That's duly noted.  Let me just say this, the rules with regard to her being

              a model tenant for the years that she's been in the program, that really

              does not factor.  That does not factor in.  If the, if the family obligations are

              not followed, we are obligated to follow the HUD regulations and terminate

              assistance if rent's not paid.  The Housing Authority was not privy to the

              verbal agreement that the owner and the tenant had.  That conversation

              was per Ms. Glover and Ms. Roberson.  But what Ms. Roberson received

              was the paperwork from the owner and that is what we act upon.  In

              addition, I understand about her financial situation; however, when income

              increases participants must report it within ten (10) days.  Once they report

              it we give them a full thirty (30) day notice before rent increases.  So they

              have proper notice before their rent will increase.  It doesn't increase the

              next month. They will have a full thirty (30) days' notice.

Glover:       It didn't.

Nuckolls:     For example, let's just assume a client comes in today and reports a

              change of income. The - and it's an increase.  The increase would not be

              effective until October 1 - Well no – September. I'm sorry, November 1,

              okay, because we give a full calendar day's notice.  So she was given

              proper notice as to when her rent was going to increase.  I'm sorry, did

              you say a dollar?  It was a dollar?

Glover:       Yes.

Nuckolls:     To Three Hundred and Three dollars ($303.00) and Ms. Roberson that

              was a result of…

Roberson:      It's an annual.

Nuckolls:      She received some in, oh, it's an annual.

Roberson:      Her annual was done.

Glover:        ...I had got that less than two weeks before the first of July. I didn't, I
               didn't get it 30 days before, prior to tell me that my rent was going up.
               They were working on it.

Nuckolls:      Okay.

Glover:        I didn't.

Nuckolls:      No ma'am, I'm not saying that you received it 30-days prior, I'm saying the
               note when you received the notice it tells you it's not effective until a full 30
               days.

Glover:        No, mine said effective July 1st and I got it like the last couple of weeks of
               June.

Nuckolls:      Cheryl, can you...

Roberson:      Yeah. It was actually processed on May 29th. Initially it was actually
               Three Fifteen (315).

Nuckolls:      Her rent?

Roberson:      Yes.

Nuckolls:      Okay.

Roberson:      And then she had another and she actually had added her granddaughter
               and it went down to 303. Initially it was processed on May 29th. It was not
               effective until July 1st.

Nuckolls:      Okay. Which would be correct, because we give you time...

14

Glover:      But she didn't finish the – she didn't finish the, the certification process until after June 17 because when we came in May, she told me to give – see if my daughter wanted to change her mind and be added back to my voucher because I was telling her I could not afford that Three Hundred dollar ($300.00) rent so she gave me another time.  It was after June 17th when she sent that letter out saying that my rent was going to be three hundred (300) and something for July.

Nuckolls:    Was the letter dated...

Roberson:    It was May 29th.

Nuckolls:    The letter is dated May 29th?

Bell:        There is another letter if I might add.

Roberson:    I also gave Ms. Glover a call on, on June 23rd.  Actually it was June 4th advising her of the rent increase of three fifteen (315).

Nuckolls:    Okay, so you called her verbally and ...

Roberson:    Yes.

Nuckolls:    ...the appropriate letter?

Roberson:    And I advised, due to the family changes you now qualify for a two-bedroom.

Nuckolls:    Okay.

Roberson:    The reason why the rent was increased so much.

Nuckolls:    Okay.

Bell:        There was also a letter, I think, dated July 2nd that said it would be effective July 1st.

Roberson:      Yeah, that's correct because with her adding her granddaughter, it took her rent down.

Bell:      Okay.

Roberson:      So that can be effective…

Nuckolls:      Right.

Roberson:      ..the next, the following month.

Nuckolls:      If it's a decrease we do

Roberson:      It was an advantage to her because her rent went down.

Nuckolls:      Correct.

Nuckolls:      If it's a decrease we do it the first of the following month from when it's reported.  If it's an increase we do the full 30 days which will - which is an advantage to the participant.

Duke:      So for clarification purposes, though, once she puts in the terminate - or the request to transfer her voucher she has to give a full month, is that correct?

Nuckolls:      Per the lease.  It could be 30 days, it could be 60 days.  It's per the lease.

Duke:      And so it also would not be reasonable to posit – if you suddenly you go from paying a dollar ($1.00) to Three Hundred Dollars ($300.00) and taking up half of your income,  it's going to be an undue burden on the family,

Nuckolls:      Unfortunately, HUD does not factor that in. The regulations state once the, once the increase is reported, then the change has to be effective a full 30

16

|            |                                                                                                  |
|------------|--------------------------------------------------------------------------------------------------|
|            | days after it's reported.  I understand the thing that you're speaking to, but the regulations doesn't take that into account. |
| Duke:      | So, first of all let's get some clarification.                                                    |
| Nuckolls:  | Okay.                                                                                             |
| Duke:      | When did Ms. Glover make her initial request to transfer her voucher?                            |
| Nuckolls? | It was July 30th. Is when the paperwork was received.                                        |
| Duke:      | Well, I saw a form in the file that says July 30th and it's crossed out and put July 3rd.  So is it July 30th or July 3rd? We have a notice… |
| Nuckolls:  | When we received the documentation it was on July 30th inside our office. That date is on the document right here. |
| Duke:      | Then what – this was obtained from your file and it says…                                         |
| Nuckolls:  | Correct.                                                                                          |
| Duke:      | …Brenda Glover, July – and 30th is clearly crossed out and this was officially crossed out and this is official, it was in your file, July 3, 2014. |
| Roberson:  | Yeah, she may have signed it July 3rd but she didn't…                                        |
| Nuckolls:  | Get it to us…                                                                                     |
| Roberson:  | …submit it to us until July 30; the stamp date on the receipt. Even with that said I think on July 30th she still would not be able to move until the following month, which is in August, based on the policy. |
| Nuckolls:  | Correct.                                                                                          |
| Duke:      | Now it's correct though that she has to get approval from Chad Williams the managing - manager of the property, before she can submit that to you all? Is that correct? |

17

Nuckolls:     That is correct.

Duke:         All right.  So essentially, the landlord can hold up her ability to transfer the voucher?

Nuckolls:     If the payments owing, yes that's correct.

Duke:         Well he alleges payment's owing, but let me ask you, do you all follow-up to – what is your procedure to follow-up to verify payments owing?  Is there any process that would verify what the landlord's telling you?

Roberson:     Well, we can call the landlord.

Duke:         But did you do that in this case?

Roberson:     Did I, did I talk directly?  No, I talked to Ms. Glover.

Duke:         Okay, and let me ask you further, you based your termination of her voucher on the landlord giving you notice saying she owes Three Hundred and Three Dollars ($303.00)?

Roberson:     Yes.

Duke:         But again, there was no follow-up at all with the landlord on whether or not he made a side deal or anything else with her that would allow her to pay her rent late based on, based on her agreement with the landlord?  Is that correct?

Roberson:     Well, I'll go back.  My interaction with the landlord's based on she owed the, the maintenance charges.  Okay.  When I called him regarding the maintenance charges he said there was an arrangement to set up for her to take her deposit and pay the maintenance charges. So at that point it's okay; no problem.  She can move. But I do have that in writing. So at that

time, no, he didn't say anything.  Well actually, it is on the document that
she did owe the charges.

Duke:      But again, it was no – there was no procedure if she disputed those
charges for her to be allowed to dispute those.

Roberson:  Sure. In the appeal.

Nuckolls:  Absolutely.

Duke:      In this appeal right now?

Nuckolls:  That's correct.

Roberson:  That's correct.

Duke:      Alright this appeal's coming (laughs)…

Bell:      It's on the eviction.

Duke:      You follow?

Roberson:  Well, but it's something you must do. According to HUD you have to.

Nuckolls:  Right.

Duke:      Well and I would dispute your interpretation of the HUD regulations on the
absolutely have to terminate someone's voucher.

Roberson:  It says...

Duke:      I also further argue that she was not given a proper due process in this
case and you're putting the burden clearly on her. And that goes back to
my first point which was never addressed.  The burden of proof should be
on the Housing Authority to have to present evidence that, in fact, she
violated the terms of the agreement.  And just a notice in and of itself
saying this is it, now it's, the burden on you, is insufficient.  It should be

19

asking for evidence. Of course in these hearings we have absolutely no power to subpoena the landlord. We have no ability to get any witnesses here against their will and so what we're essentially having to come in here and disprove a positive, which is not possible for us to do. If Ms. Glover is only testimony – the only testimony here today is from Ms. Glover saying the landlord agreed to accept my rent late. You're basically saying that any time a landlord makes an agreement with you to accept payment late and then reneges on the agreement, he's allowed to have the tenant be terminated from her voucher at that point and just – you have no control over that.

Nuckolls:   That's correct.

Duke:   When in fact you do have control over that because if you believe her testimony today that the landlord, in fact, agreed to allow her rent to be late, then her rent's not technically late if the landlord allows her to pay rent past the date stated in the lease.

Nash:   I think what you're saying is they rely on the four corners of the docket. They can't...

Nuckolls:   Exactly.  We rely on what's in writing.

Nash:   This person could come in here and say there was no agreement. She says there is an agreement.  So they just go by the document, sir.

Duke:   But we don't know...

Nash:   Otherwise, I'm gonna interrupt you, but I don't want you to ...

Nuckolls:   Right.

Nash:        …make their interpretation for them. That's not what they're saying.

Duke:        So your position is regardless of what the testimony is at the hearings we

             have to go by what's at this hearing, we're going to go on documents

             alone.  Even if the landlord came in here, which again, we had no power

             to subpoena the landlord.  The landlord was not talked to about whether or

             not the rent was owed.  That's correct. The landlord was not talked to

             about whether or not rent was owed or whether or not there was an extern

             (sic) extern – extra, extern… it's extemporous (sic) agreement between

             her and the landlord on whether the rent was owed. We're just going

             solely by what the landlord did. There's no investigation at all, is that

             correct?

Roberson:    Well I will say this.  I did talk to Ms. Glover directly regarding the, the

             unpaid rent and she said yes, she did not pay the rent.

Duke:        But that…

Roberson:    And she also…

Duke:        …but wait, wait, wait, wait, wait.

Roberson:    But to your verifying if the rent was – how do we know if the rent was paid

             by verification of her verbal.

Duke:        But again, she also told you that it was not paid because the landlord said

             she could have until a later date.

Roberson:    Okay, so…

Duke:        Am I correct on…

Roberson:     …just going on that, that's not paid,  The 10-day process, the eviction

notice still has to be processed 'cause it's not paid.

Bell:           Which it was and…

Roberson:      And regardless of whether there was an arrangement or not, it's still not

paid.

Bell:           Right.  But it's my understanding she actually received a notice for the

Housing Authority based on the notice to evict.

Nuckolls:     That's correct.

Roberson:     That is correct.

Bell:            And under the regulation there actually has to be a physical eviction.

Notice…

Nuckolls:     No.

Bell:           Notice alone is not enough.  And that's what the regulations say, the

notice of eviction because the eviction is an actual judicial process and

basically this particular landlord used a criminal statute, if we're

understanding, they used Arkansas Criminal Statute Notice to Vacate

which is not a judicial process. So at this point the notice of eviction is why

her voucher is being terminated and your notice under the regulation is not

enough.

Nuckolls:     She's being terminated for nonpayment of the rent, because she did not

pay the rent.

Bell:           Based on the – based on our letter, and that's what we're trying to figure

out because those are two separate things.  It was notice of eviction.

22

Nuckolls:       You're talking about the termination letter?

Bell:           Yes. Uh-huh.

Nuckolls:       Okay.

Bell:           That's what that letter says.

Nash:           Well see just like you said, all these things will be considered. That's why we're having a hearing.

Bell:           Right.  And I guess that's what I'm just trying to…

Nash:           You have to make your argument…

Bell:           …just trying to figure out.

Nash:           …she'll look at it, including, you know, what, what, what you're saying Ms. Glover is saying verbally took place.  I mean no decision has been made.

Bell:           Right.

Nash:           That's why they're having the hearing…

Bell:           Sure, and I guess I just…

Nash:           So that if counsel is looking for her, for Ms. Nuckolls to say, yeah, yeah, you're right.

Bell:           No, no, no.  She's just taking – I just want it duly noted under the regulation that it does state that a landlord's action in giving the notice of eviction is not grounds for terminating a subsidy.  So that is in the regulation.  And if I need to – 'cause all of these numbers, they roll together, but there also is an actual case, Ms. Nuckolls.  And in that case eviction in the regulation means physically evicted which, what I stated to you earlier about legal process, permitting an eviction because at that

23

point there is a hearing or a criminal -- and that burden for us to prove

whether or not, and whether the Judge throws it out, whether the

prosecutor, as Mr. Nash you know, wanted to, you know, kind of verify,

separate those two items out if it was, you know, null pros by the

prosecutor. Prosecutor basically didn't have enough evidence and/or if

there was an agreement in place. And so the actual eviction and I guess

that, you know, with us trying to prepare for this it was kind of, a little

difficult. But in reference to just wanting to state on the record as far as the

terminology that the Housing Authority is using versus the terminology of

the HUD regulation as far as what an eviction actually is. And then we

would like to note that an eviction means a physical eviction not mere

notice because that's a separate hearing.  And so at that point I believe

we're saying that it was premature and that's under the regs where it talks

about specifically premature public housing agency terminations.  And so

we're at this point saying that it was premature for that letter to go out

merely on a notice.

| | |
|---|---|
| Nuckolls: | Duly noted. |
| Bell: | (Laughs). |
| Roberson: | Okay,   I just, I just want… per our admin plan it says termination of |

tenancy by an owner evictions – it's under 24 CFR 982.310 it says the

owner, if the owner wishes to terminate the lease, the owner must provide

proper notice as stated in the lease. If that's stated in the lease then that is

proper notice. The owner must provide the tenant a written notice

specifically specifying the grounds for the termination of tenancy at or before the commencement of the eviction action.   The owner eviction notice means a notice to vacate or a complaint to, or initial pleading used under state or local law to commence on eviction actions.  So to me that's still saying a written notice. Without that written notice, how do you act? How do you act on the termination?  You can't.

Bell:      I mean we are saying that a judicial order has to be entered.

Roberson:   And that's the outcome.  Just like I think Marshall was saying, that happens in the appeal, after the outcome.  After the outcome, then, then actually...

Bell:      But you guys had already sent her a letter terminating her voucher based on...

Roberson:   Based on the notice. And we have to...

Bell:      So again, you mentioned about the outcome because at that point the landlord is able to file the notice to vacate if for some reason, just to file it, you know, just for whatever reason.

Roberson:   Sure.

Bell:      Nonpayment, they don't like them, and then as, you know, we're mentioning that the burden is then on the actual recipient to prove...

Duke:      That they didn't do it.

Bell:      ...that they didn't do in reference to because landlords in and of themselves use this criminal statute pretty leniently.

Roberson:    Yeah, but I think it's really – it's spoken (sic) up to saying it's a serious

violation.  Not paying the rent is a serious violation.

Bell:    Right.  But the regulation also says that a one-time payment; a one-time

missed payment is not a serious violation. And that is in the reg.  Yeah, it's

in the reg.

Nash:    Well go ahead and cite the...

Bell:    Okay...

Nash:    You didn't.

Bell:    I'm sorry.

Nash:    So that we'll have it as...

Bell:    Okay.  I mean, here it is right here.  In reference to under, I believe this is

CFR247 that a de minimis breach the language supports the position – I'm

sorry, let me get back to that.  Oh, excuse me, the regulations refer to a

failure to make payments, with an s, and that's in quotes, due under the

lease rather than a failure to make, quote, a payment, end quote, due.

This use of the plural implies that a one-time only default in rent is not a

sufficiently serious violation to justify termination under, of the tenancy.

Duke:    But I want some – can I get just – before we close can I get some

clarification?  Again, there's been a lot of talk back and forth and I'm very

confused at this point.  If y'all receive a notice to vacate by the landlord,

regardless of the reason, rent or any other reason, is the Housing

Authority's position that the voucher will be terminated at that point?

Nuckolls:    If it's a violation of family obligations, yes.

Duke:       Just by receiving that notice, without a court order finding that the tenant, in fact, did violate the terms of the lease?

Nuckolls:   That is correct.

Duke:       Okay. That's all I needed to know.

Bell:       So, at this point, under the regs, as far as – is it 9? Let me make sure Mr. Nash. So under 982.31 – 982.311 as far as the assistance it is terminated and I guess my position is to figure out the Housing Authority – it states that those must continue making those housing assistance payments to the owner with the HAP contract until the owner has obtained a court judgment or other process allowing the owner to evict. And that is Section 982.311 little b.

Nuckolls:   Okay.

Bell:       And that's all.

Nuckolls:   Okay.

Duke:       And it's my understanding us you all a decision in 10 days, is that correct?

Nuckolls:   That is correct.

Duke:       Let me ask...

Nuckolls:   Business Days.

Duke:       Ten business days.

Nuckolls:   That is correct.

Duke:       Let me ask then, until that occurs is her housing voucher still being paid to the landlord?

Nuckolls:   Yes.

27

Duke:        So…

Nuckolls:    The rent continues to be paid, if she's in the unit.

Duke:        She's in the unit.  So the current landlord is continually receiving rental payment from you all?

Nuckolls:    That is correct.

Duke:        Okay.

Nuckolls:    Our portion. That is correct.

Bell:        So, and I guess just for clarification, we did receive a screenshot…

Nuckolls:    Okay.

Bell:        …that there was going to be an adjustment.

Roberson:    Based on her, the voucher, the eviction expiring on August 21st, yes.

Bell:        Okay.  So the adjustment is – and I guess I'm trying to make sure I understand Ms. Nuckolls…

Roberson:    It's still pending.  It's still pending.

Bell:        Okay.  So, it's just…

Roberson:    Pending.

Bell:        Pending.  A screenshot of…

Roberson:    So you're – so basically I would say the outcome.

Bell:        Okay.

Roberson:    Because I, again, from that I think what Asonja…

Bell:        I just want to make sure…

Nuckolls:    You're fine.

Duke:        You're still making rental payments to the landlord, though?  Okay.

Roberson:     That is a pending adjustment on there. It hasn't posted yet.

Nuckolls:     Right.

Duke:         What's the status of her request to transfer at this point?

Roberson:     That has to be determined, I would think.

Nuckolls:     Right.

Nuckolls:     No decision has been made until the decision of the outcome of this hearing.

Duke:         Well pending the – of course we're already into September and so we're at a new month again which means she would have to pay, if she's not allowed to transfer another Three Hundred dollars ($300.00) which again is a humongous burden on a client who only has Seven Hundred and Forty Dollars ($740.00) a month, so I guess the question is would she be allowed to transfer at this point? I know the decision has not been made yet but would she be allowed to transfer at this point since we're still pending?

Nuckolls:     No. We cannot...

Duke:         She'll not be allowed to...

Nuckolls:     ...process, we cannot process. We cannot process any move while she's in the process of a termination and a final decision has not been made. No.

Duke:         Okay. One final thing I'd just like to point out for the record.

Nuckolls:     Sure.

Duke:       If you look at her notice that she received on when she's entitled to a

            hearing, it does say 14 calendar days. She timely made that request;

            however the hearing wasn't set until 14 business days.  You all take the

            position that 14 business days is the days that you are open for business

            Monday through Thursday.  So I just want to make that point as well

            'cause the notice actually clearly states 14 calendar days and this is

            outside of that time period.  But that's – I don't have anything else.

Nash:       She's not, she's not without housing, right?

Nuckolls:   No.

Nash:       Okay. I just want to make sure it will go on record she's not injured in that

            regard.

Duke:       Well except that she's - it's precluded her from allowing her to timely

            transfer her voucher and now that would mean she has to pay another

            Three Hundred Dollars ($300.00) under her current tenancy.

Nash:       Okay.

Duke:       It's a humongous burden on her.

Nuckolls:   Has she paid the September rent?

Duke:       She's not paid it yet.

Nuckolls:   Okay.

Glover:     He don't want it.  He doesn't want it.

Nuckolls:   I would just like to put on the record since you consistently mentioned

            about the burden, her financial burden, HUD clearly says that participants

            must pay thirty percent (30%) of their rent.  It doesn't matter if they have a

car note.  It doesn't matter if they have a cell phone or whatever else is
going on. You have to pay thirty percent (30%) of your monthly adjusted
rent towards – monthly adjusted income towards the rent and we're not
allowed to factor in anything in but utilities that she has to pay.

Bell:       And I would just – one last thing also, Ms. Nuckolls, just for
            consideration…

Nuckolls:   Yes.

Bell:       …it does mention in the actual appeal as far as the hearing, that the
            Hearing Officer is able to consider those things.

Nuckolls:   Okay.

Bell:       And other circumstances in reference to…

Nuckolls:   I'm, I'm sorry, can you be a little more clear on that?  The Hearing Officer
            is …

Bell:       Within the actual appeal…

Nuckolls:   Okay.

Bell:       …under the hearing, the hearing itself, that the Hearing Officer is able to
            consider other factors, other circumstances, within the actual…

Nuckolls:   Okay.

Bell:       …for the appeal.

Nuckolls:   Yes.

Bell:       So, in essence, the regs give that discretion.

Nuckolls:   Okay.  Thank you. Anything else?

Duke:       We have nothing further.

Nuckolls:      Okay.  And that will conclude the hearing with Ms. Brenda Glover.  I am

going to stop the recording now.

# EXHIBIT 5

September 25, 2014

Brenda Glover
1414 West 11th Street
Little Rock, AR 72202

Dear Ms. Glover

An appeal hearing was held on September 4th 2014 regarding the termination of your housing assistance.   MHA's decision to terminate your housing assistance is sustained based on their policy. This decision is based on the following MHA policy and/or federal regulations:

 o MHA Administrative Plan Ch.15 *Denial or Termination of Assistance.* If any family member violates any Family Obligation under the program as listed in 24 CFR 982.551

 o You attempted to pay your August 2014 rent of $303 late however owner refused to accept it. MHA has no written agreement between you and the owner substantiating there was a mutual agreement to pay your rent late.

 o Not paying rent in accordance with your lease agreement is a serious violation of your lease.

Through careful review and consideration of the evidence listed above, it appears that MHA followed proper polices and federal regulations related to the termination of housing.

Respectively,

Sonja L. Nuckolls
Hearing Officer

# EXHIBIT 6



*Founded 1965*

# CENTER FOR ARKANSAS LEGAL SERVICES

*Equal Justice For All*

September 29, 2014

### DEMAND LETTER

Metropolitan Housing Alliance
Attn: Rodney Forte, Executive Director/
and Board of Commissioners
100 South Arch Street
Little Rock, Arkansas 72201

Re: Tenant's Name: Brenda Glover

Dear Mr. Forte:

This office represents tenant, Brenda Glover. Our office has been retained to represent Ms. Glover regarding her voucher under the federal Housing Choice Voucher program (also referred to as Section 8). Our office has made several attempts to make contact with your agency, Metropolitan Housing Alliance, thereafter, MHA, in an effort to communicate with you regarding the above referenced matter. In fact, a multitude of calls and messages were left in unsuccessful attempts to receive the decision as to Ms. Glover's housing assistance termination. Moreover, the decision was received far in excess of the ten days provided by MHA's own HCV Administrative Plan.

MHA is a public entity that was formed to provide federally subsidized housing and housing assistance and is subject to the requirements of Title 24 of the Code of Federal Regulations and MHA's HCV Administrative Plan. Hearings under this section are provided to those individuals who are denied and/or terminated from the housing choice voucher program. According to MHA's HCV Administrative Plan, "it is MHA's objective to resolve disputes at the lowest level possible, and to make every effort to avoid the most severe remedies. However, if this is not possible, the MHA will ensure that applicants and participants will receive all of the protections and rights afforded by the law and the regulations."

### Inadequate Notice of Termination Housing Subsidy

The purpose of requiring that notice be given to the tenant before the hearing is to insure that the tenant is adequately informed of the nature of the evidence against him so that he can effectively rebut that evidence. The instant one-sentence summary notices are inadequate for this purpose. *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 105, 107, 83 S.Ct. 1175, 10 L. Ed.2d 224 (1963); *Dixon, supra,* 294 F. 2d at 158-159.

Ms. Glover's Termination of Housing letter dated August 12, 2014 literally stated her reason for termination was "Ten day Eviction Notice to vacate for back rent owed in the amount of $303 for August". See Termination of Housing Assistance Payments letter attached hereto.

## Violation of Rules Setting Initial Hearing

According to the letter dated August 12, 2014, a hearing was to be scheduled "within 14 calendared days from the date of receipt of the completed request form." Ms. Glover requested a hearing on August 14, 2014. Therefore, following the written guidelines sent to Ms. Glover the hearing should have been scheduled no later than August 28, 2014. Ms. Glover's hearing did not occur until September 4, 2014. This was only after repeated request by Ms. Glover's legal counsel to set the hearing.

## Violation of Proper Standard

Pursuant to 24 CFR 985.555 an administrative hearing was held September 4, 2014. This hearing was attended by tenant, Brenda Glover, two staff attorneys from Center for Arkansas Legal Services, Dustin Duke and Joycelyn Bell, caseworker, Cheryl Roberson, hearing officer, Asonja Nuckolls, and attorney Marshall Nash. Under the Administrative Plan, "the Hearing Officer will determine whether the action, inaction or decision of the MHA is in accordance with HUD regulations and this Administrative Plan based upon the evidence and testimony provided at the hearing. Factual determinations relating to the individual circumstances of the family will be based on a preponderance of the evidence presented at the hearing" Chapter 18, Title Complaints and Appeals, Section D-Informal Hearing Procedures.

HUD regulations establish substantive rights at issue and the basic procedures to be followed in administrative hearings. 24 CFR 982.555(e)(6) states that:

The person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision. Factual determinations relating to the individual circumstances of the family **shall be based on a preponderance of the evidence presented at the hearing**. A copy of the hearing decision shall be furnished promptly to the family.

Ms. Nuckolls was either unable or unwilling to delineate the burden of proof being followed in the hearing. Her response when Mr. Duke tried to raise this issue was that it was not something we will get into. In addition, Ms. Nuckolls does not state what burden of proof she is considering when making her determination. Therefore it is unclear if the determination was made using the proper burden of proof.

Regulations, cases, and other guidance have established some specific ground rules for hearings, including the nature and conduct of the hearing officer. Specifically, hearing officers are to have the appearance of impartiality. Succinctly stated, *Goldberg* requires:
    (1) timely and adequate notice detailing the reasons for a proposed termination
    (2) an opportunity on the part of the tenant to confront and cross-examine adverse witnesses

(3) the right of a tenant to be represented by counsel, provided by him to delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination and generally to safeguard his interests

(4) a decision, based on evidence adduced at the hearing, in which the reasons for decision and the evidence relied on are set forth and

(5) **an impartial decision maker.** Emphasis added. *Goldberg v. Kelly, supra,* 397 U.S. at 269, 90 S.Ct. at 1021.

As a matter of due process Ms. Nuckolls cannot argue MHA's case and act as an impartial hearing officer.

Furthermore, Mr. Marshall Nash, appeared to control the evidence that was allowed to be presented at the hearing. Mr. Nash was characterized as "the attorney" for MHA. Ms. Nuckolls deferred to Mr. Nash often thus abandoning her role as the impartial hearing officer. An example of this would be Mr. Nash's statement that they could only consider the four corners of the document when Ms. Glover attempted to testify as to her agreement with the landlord. The document referred to by Mr. Nash was the Notice to Vacate/Ten(10) Day Eviction Notice dated August 11, 2014. Attached hereto.

## Violation of Due Process Rights

Ms. Glover's due process rights were further violated when she was not properly given an opportunity to confront and cross-examine persons who supplied the information upon which her termination was based. *Goldberg v. Kelly, supra,* 397 U.S. at 270, 90 S.Ct. at 1021; *Willner,* 373 U.S 96, 83 S.Ct. 1175 (Goldberg, J., concurring); *In re Williams, supra* 309 N.Y. S.2d at 460; see *Dixon, supra,* 294 F.2d at 159. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." Id. The tenant must be adequately informed of the nature of the evidence against him and accorded an adequate opportunity to rebut the evidence. *Willner, supra,* 373 U.S. at 107, 83 S. Ct. 1175 (Goldberg, J., concurring). Mr. Nash and Ms. Nuckolls refused to consider any other evidence attempted to be presented by Ms. Glover or her counsel.

Again, while it is unclear as to what the determination was based on the decision alludes to Ms. Glover's failure to pay rent for August of 2014. However, in MHA's own file was a written agreement between Ms. Glover and the landlord whereupon he agreed that the outstanding balance owed would be paid with her security deposit. See Authorization for Mutual Rescission of Section 8 lease attached hereto. It is unclear throughout the proceedings and in the decision as to exactly what the determination was based. However, Mr. Nash's statement that MHA could only consider the four corners of the document show that not only was not all evidence being considered but that Ms. Glover's right to cross exam witness' was denied. This is in direct conflict of MHA's own administrative plan that states "evidence **may** be considered without regard to admissibility under the rules of evidence." MHA HCV Administrative Plan Chapter 18 Sec. D.

Finally, Ms. Nuckolls herself raised the September 3, 2014 Notice to Vacate during the hearing. It is unclear as to what Ms. Nuckolls was attempting to use this document as a basis for but federal regulations clearly state that termination of housing assistance cannot be based on evidence outside of the hearing and shall concern only the issues for which the family has received the opportunity for hearing. The letter dated August 12, 2014 indicates that the termination of housing assistance was due to "Ten day eviction notice to vacate for back rent owed in the amount of $303 for August" Therefore, evidence regarding a subsequent Notice to Vacate was improper. 24 CFR 982.555 and MHA HCV Administrative plan Chapter 18 Sec. D.

## Inadequate Written Decision

According to federal regulation the written decision must adequately explain the reasoning behind the termination. 49 Fed. Reg. 12, 214, 12, 230:

> The statement of decision required by the regulation must be truly informative as to the reasons for the decision. This would include a short statement of the elements of fact or law on which the decision is actually based. A bare and conclusory statement of the hearing decision, that does not let the participant know the basic reasons for the decision, will not satisfy the regulatory requirement.

Multiple court decisions in favor of PHAs have been overturned on the ground that they were insufficiently explained or failed to state whether the hearing officer considered mitigating factors.

Ms. Nuckolls' decision fails to sufficiently explain why Ms. Glover's voucher was terminated. Her decision contained only three general bullet points. See letter from Asonja Nuckolls dated September 25, 2014 attached hereto. The first does not specifically state what family obligation was violated under the federal regulations. The second point that addressed "no written agreement" is directly contradicted by the Authorization for Mutual Rescission of Section 8 Lease contained in Ms. Glover's file and as discussed above was not considered as evidence. The third point regarding not paying rent in accordance with lease agreement is a conclusory statement and unclear as to what regulation was violated.

Moreover, nowhere in Ms. Nuckolls' decision does she consider any mitigating factors. Ms. Glover's counsel repeatedly tried to present testimony as to Ms. Glover's history of being a model tenant with no other issues prior to this incident and most importantly Ms. Glover's exceptionally limited income.

Throughout the entire process it has been unclear as to why Ms. Glover's assistance was being terminated. It was unclear in the letter terminating her assistance dated August 12, 2014. It was unclear at the hearing. It was unclear in Ms. Nuckolls' written decision.

**Violation of Rules Setting Rendering of Decision**

Furthermore, the MHA Administrative Plan states that the "issuance of the decision will be no later than 10 days after the hearing…". MHA HCV Administrative Plan, Chapter 18, pg. 140. As stated earlier the hearing took place, September 4, 2014. The decision in this case was not made until September 25, 2014 well after the 10 days provided by MHA's own Administrative plan. In fact, the decision was only received after legal counsel made repeated attempts to contact MHA for the decision.

**Improper Delay in Payment of Housing Subsidy**

In addition,  MHA is required by statute to continue to pay Ms. Glover's housing subsidy in accordance with the HAP contract. 24 C.F.R. § 982.311(b) states that the PHA **must** continue payments until the landlord obtains a court judgment ordering an eviction. "However, if the owner has commenced the process to evict the tenant, and if the family continues to reside in the unit, the PHA **must** continue to make housing assistance payments to the owner in accordance with the HAP contract until the owner has obtained a court judgment or other process allowing the owner to evict the tenant." 24 C.F.R. § 982.311(b) (1999); see also *DeProfiq v. Waltham Hous. Auth.*, 22 Mass. L. Rptr. 677 (Mass. Super. Ct. 2007) (regarding the regulations, an eviction occurs when the tenant is "physically evicted," not during the legal processes for an eviction).  Moreover, MHA continues to terminate housing assistance to housing choice voucher recipients upon simply being notified of a notice to vacate by the landlord in direct contradiction of 24 C.F.R. § 982.311(b) and case law and has done so to Ms. Glover.

During the hearing, it was uncertain as to why Ms. Glover's voucher was being terminated. She has not been evicted, and a notice of eviction is not grounds for a termination of a housing voucher. Furthermore, Ms. Glover has not committed any serious offenses that require a termination of her housing assistance voucher. Under this regulation, the PHA must continue paying Ms. Glover's housing assistance because Ms. Glover did not move out of the residence, nor did the landlord obtain an order for her eviction. The MHA is in violation of federal regulation due to the fact that Ms. Glover's rent subsidy was not distributed to the landlord in September until the 25th and again after repeated requests by counsel.  This late payment, in violation of federal law, has subjected Ms. Glover to a criminal citation for failure to vacate.  The citation could potentially result in incarceration.  This is further in contradiction to HUD's policy that "criminal eviction" is not an acceptable method of evicting tenants who receive housing subsidy.

**Conclusion**

The MHA Board of Commissioners is not bound by the hearing decision. Under the MHA HCV Administrative Plan, the MHA is not bound by a hearing decision that is in conflict with or contradicts HUD regulations or requirements, or Federal, State, and Local laws. Chapter 18, p. 140. This is in accordance with 24 C.F.R. § 982.555(f)(2) which states the same. Should the MHA decide that it does not wish to follow the decision of the hearing officer, it must inform the participant within 10 business days, pursuant to 24 C.F.R. § 982.555(f)(3), and the MHA HCV Administrative Plan, located on p. 141.

The purpose of this letter is to demand MHA resume paying Ms. Glover's voucher under the Housing Choice Voucher program and immediately allow Ms. Glover the opportunity to transfer her voucher to a suitable size housing arrangement.

This is a serious matter which requires your immediate attention.  The delay on the part of the MHA has left Ms. Glover in an untenable position.  We will give you an opportunity to fulfill the requests before suit is filed; however, adherence must be made in strict accordance with the terms of this letter.  To avoid legal proceedings, we demand MHA resume paying Ms. Glover's voucher under the Housing Choice Voucher program, immediately allow Ms. Glover the opportunity to transfer her voucher to a suitable size housing arrangement, and pay the full amount of the rent prior to the change in her household composition until her transfer is completed.  Other than this letter, no additional demand will be made upon you to comply prior to suit being filed.

We look forward to receiving your prompt payment.

Sincerely,

Center for Arkansas Legal Services
1300 West 6th Street
Little Rock, Arkansas  72201


Stacy D Fletcher
Attorney at Law


Joycelyn Bell
Attorney at Law


Dustin Duke
Attorney at Law

6

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**BRENDA GLOVER, on behalf
of herself and all others similarly
situated,**                                                        **PLAINTIFF**

**v.**                          **CASE NO. _____**

**HOUSING AUTHORITY OF THE
CITY OF LITTLE ROCK, d/b/a
METROPOLITAN HOUSING
ALLIANCE, and RODNEY FORTE,
Executive Director of Metropolitan
Housing Alliance, in his Official Capacity,**

                                                                    **DEFENDANTS**

## DECLARATION OF JOHN C. WILLIAMS

1) I am counsel for Plaintiff in this case.

2) On October 24, 2014, I sent Defendant Forte a request to inspect records under the Arkansas Freedom of Information Act. The request sought documentation showing the frequency with which MHA has terminated Section 8 benefits on the basis of a notice to vacate over the past three years. The request is attached to this declaration as Attachment A.

3) After further email correspondence, another MHA employee, Marshall Nash, informed me that MHA terminated Section 8 benefits on the basis of a notice to vacate 964 times from October 24, 2011, to October 24, 2014. My email correspondence with Nash is attached as Attachment B.

1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

/s/
John C. Williams

Date: 3 November 2014

# ATTACHMENT A

# CARNEY ▼ BATES ▼ PULLIAM

Carney Bates & Pulliam PLLC

October 24, 2014

**VIA EMAIL**
Rodney Forte
Executive Director
Metropolitan Housing Alliance
100 South Arch Street
Little Rock, AR 72201

                    Re:     *FOIA Request*

Dear Mr. Forte:

I am writing to request public records pursuant to the Arkansas Freedom of
Information Act. I am sending this request to you via email pursuant to
instructions on the Metropolitan Housing Alliance website.

Specifically, for the period from October 24, 2011, to October 24, 2014, please
provide a copy of (1) all notices to vacate MHA received from landlords for
Section 8 program participants; (2) all letters MHA sent to Section 8 program
participants terminating their Section 8 housing assistance on the basis of a notice
to vacate; and (3) any final written decision that resulted from an informal
hearing regarding the termination of Section 8 housing assistance on the basis of
a notice to vacate.

I would like to schedule a time to inspect the records on Monday. If I can provide
you with any other information to help fulfill this request, please call me at the
number below. Thank you for your assistance.

Sincerely,

John C. Williams

www.CBPLaw.com
11311 Arcade Drive, Suite 200, Little Rock, AR 72212
p. 501-312-8500  f. 501-312-8505  tf. 888-551-9944

# ATTACHMENT B

## John Williams

| | |
|---|---|
| **From:** | Marshall Nash <mnash@mhapha.org> |
| **Sent:** | Wednesday, October 29, 2014 10:55 AM |
| **To:** | John Williams |
| **Subject:** | RE: Numbers |

Here's what I've learned:

Yes, 10/24/2011 – 10/24/214. Sorry for the typo.

---

**From:** John Williams [mailto:jwilliams@cbplaw.com]
**Sent:** Wednesday, October 29, 2014 9:24 AM
**To:** Marshall Nash
**Subject:** RE: Numbers

Hi Marshall,

Thank you for the response. Just to clarify, is the last day of the period 10/24/14? You wrote "1/24/14."

John

---

**From:** Marshall Nash [mailto:mnash@mhapha.org]
**Sent:** Wednesday, October 29, 2014 9:16 AM
**To:** John Williams
**Subject:** Numbers

Hi John:

Here's what I've learned:

There are 964 terminations for 10/24/11-1/24/14.  We do not have a way to calculate the number of appeals during this time period.

---

CONFIDENTIALITY NOTICE: This e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521,and is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please reply to the sender that you have received the message in error, and then delete it. Thank you.

# John Williams

| | |
|---|---|
| **From:** | Marshall Nash <mnash@mhapha.org> |
| **Sent:** | Tuesday, October 28, 2014 12:38 PM |
| **To:** | John Williams |
| **Subject:** | Re: FOIA Request |

It's being worked on

Sent from my iPhone

On Oct 28, 2014, at 10:27 AM, "John Williams" <jwilliams@cbplaw.com> wrote:

> Sounds good. Thanks for the update.
>
> **From:** Marshall Nash [mailto:mnash@mhapha.org]
> **Sent:** Tuesday, October 28, 2014 10:27 AM
> **To:** John Williams
> **Subject:** RE: FOIA Request
>
> Hi John:
>
> Went down there and the person I'm relying on is not available.  I'll follow up again within a couple of hours and keep you posted.
>
> **From:** John Williams [mailto:jwilliams@cbplaw.com]
> **Sent:** Tuesday, October 28, 2014 10:13 AM
> **To:** Marshall Nash
> **Subject:** RE: FOIA Request
>
> Hi Marshall,
>
> I just wanted to check when I can expect to receive the numbers. Thanks,
>
> John Williams
>
> **From:** Marshall Nash [mailto:mnash@mhapha.org]
> **Sent:** Monday, October 27, 2014 11:10 AM
> **To:** John Williams
> **Cc:** Rodney Forte
> **Subject:** Re: FOIA Request
>
> Raw numbers will not be an issue. I can provide that at no charge. Thanks  for clarification. That saves us a lot of time and money.
>
> Sent from my iPhone
>
> On Oct 27, 2014, at 11:03 AM, "John Williams" <jwilliams@cbplaw.com> wrote:
>
> > HI Marshall,

1

Thanks for your response. Just to clarify, I'm not asking for copies of the documents. I'm just asking to inspect them at your office. So there should be no charges for production.

There may be a way to avoid the other issue you identify. What I'm interested in is a raw number. In the time period from October 24, 2011, to October 24, 2014, how many times has MHA 1) terminated Section 8 assistance on the basis of a notice to vacate and 2) upheld that termination if it was appealed through an informal hearing? If you have some sort of report stating those numbers, that would suffice.

If you don't have those numbers readily available, though, I'd generate them myself using the documents requested. I believe these documents will contain only the name and address of the benefit recipient. That sort of information is part of many public records. What is your basis for withholding that information or for redacting it at my expense? I don't see one in the FOIA.

If you don't have the raw numbers, and if you're still of the position that I'd be charged to inspect the documents I requested, please let me know the legal basis for that position. Otherwise, I can come by to look at the documents when they're ready.

Sincerely,
John Williams


**From:** Marshall Nash [mailto:mnash@mhapha.org]
**Sent:** Monday, October 27, 2014 8:42 AM
**To:** John Williams
**Cc:** Rodney Forte
**Subject:** FOIA Request

Hi John:

We are in receipt of your FOIA request. We will produce the documents and have them at the front desk for you to pick up after completion. Is there a certain dollar amount you wish us not to exceed as it relates to the production of the documents?

Additionally, your request involves privacy issues related to the names of individuals, where they live, participation in government subsidy, etc. At this point, I'm not sure how much volume we're talking about but if the documents are substantial, we will have to hire additional labor to pull, inspect, copy, and redact the information. All of this would be at your expense.

Let me know if you wish to narrow the scope of your request and/or if you are OK with expense amount up to a certain point related to your request; or if you have no cap as it relates to expenses.

Sincerely,

Marshall Nash

CONFIDENTIALITY NOTICE: This e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521,and is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the

intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please reply to the sender that you have received the message in error, and then delete it. Thank you.

---

CONFIDENTIALITY NOTICE: This e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521,and is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please reply to the sender that you have received the message in error, and then delete it. Thank you.

---

CONFIDENTIALITY NOTICE: This e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521,and is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please reply to the sender that you have received the message in error, and then delete it. Thank you.